IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| ANGELIC JOHNSON and SARAH STODDARD,<br><br>      Plaintiffs,<br><br>      v.<br><br>JOCELYN BENSON, in her official capacity as Michigan Secretary of State; and JEANNETTE BRADSHAW, in her official capacity as Chair of the Board of State Canvassers for Michigan,<br><br>      Defendants. | No.<br><br>**COMPLAINT**<br><br>[Civil Rights Action under 42 U.S.C. § 1983] |

Plaintiffs Angelic Johnson and Sarah Stoddard (collectively referred to as "Plaintiffs"), by and through undersigned counsel, bring this Complaint against Defendants, their employees, agents, and successors in office, and in support thereof allege the following upon information and belief:

### INTRODUCTION

1. Fair and honest elections are the lifeblood of our constitutional republic. Its survival depends upon it. Accordingly, the American people demand and deserve honest, fair, and transparent elections. They demand and deserve a process that ensures that their *legal* votes will count and that *illegal* votes will not. In fact, the Constitution requires it, and for good reason, as demonstrated further in this Complaint.

2. When the State legislature vests the right to vote for President in its people, as Michigan has done here, "the right to vote as the *legislature* has prescribed is fundamental; and one source of its fundamental nature lies in the equal weight accorded to each vote and the equal dignity owed to each voter." *Bush v. Gore*, 531 U.S. 98, 104 (2000) (emphasis added).

3. "The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise. Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another. . . . It must be remembered that 'the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.'" *Bush*, 531 U.S. at 104-05 (quoting *Reynolds v. Sims*, 377 U.S. 533, 555 (1964)). Permitting the counting of illegal votes creates the very debasement and dilution of the weight of a citizen's legal vote that the Fourteenth Amendment prohibits.

4. In Michigan, the Secretary of State, Jocelyn Benson, a registered Democrat, acting unilaterally and without legislative approval, flooded the electoral process for the 2020 general election with absentee ballots. This was accomplished by the Secretary of State's unilateral decision to send absentee ballot request forms to every household in Michigan with a registered voter (regardless of whether the voter was still alive or actually resided at that address) and to non-registered voters who were temporarily living in the State. Furthermore, the Secretary of State permitted online requests for absentee ballots without signature verification, thereby allowing for fraud in the process of obtaining an absentee ballot. These actions were not approved or authorized by the State legislature, and for good reason. Predictably, this flood of unauthorized, absentee ballots ensured the dilution of lawful votes and precipitated an unfair and dishonest 2020 general election, as the evidence adduced from the TCF Center in Detroit, Michigan proves.

5. There are a few exceptional cases in which the United States Constitution imposes a duty or confers a power on a particular branch of a State's government. Article II, section 1, clause 2 is one of them. It provides that "[e]ach State shall appoint, in such Manner as the

Legislature thereof may direct," electors for President and Vice President.  Art. II, § 1, cl. 2.  As the Supreme Court explained in *McPherson v. Blacker*, 146 U.S. 1, 35 (1892), this provision of the Constitution "convey[s] the broadest power of determination" and "leaves it to the legislature exclusively to define the method" of appointment. *Id.* at 27.  A significant departure from the legislative scheme for appointing Presidential electors runs afoul of this constitutional mandate.

6.     Not even the Michigan Constitution can confer extra authority on the Secretary of State to change or alter the election procedures established by the State legislature.  *McPherson*, 146 U.S. at 35 (acknowledging that the State legislature's power in this area is such that it "cannot be taken from them or modified" even through "their state constitutions"); *see also Bush v. Palm Beach Cnty. Canvassing Bd.*, 531 U.S. 70 (2000).

7.     And, perhaps most important for purposes of the current situation, the Secretary of State cannot rely on the declared pandemic as a rationale for circumventing the intent of the legislature and acting unilaterally to implement procedures that undermined the integrity of the 2020 general election. *Carson v. Simon*, No. 20-3139, 2020 U.S. App. LEXIS 34184, at *17-18 (8th Cir. Oct. 29, 2020) (holding that "the Secretary's attempt to re-write the laws governing the deadlines for mail-in ballots in the 2020 Minnesota presidential election is invalid.  However well-intentioned and appropriate from a policy perspective in the context of a pandemic during a presidential election, it is not the province of a state executive official to re-write the state's election code").

8.     The rule of law, as established by the United States Constitution and the State legislature, dictates that the Secretary of State follow these rules.  There is no pandemic exception. *See Democratic Nat'l Comm. v. Wis. State Legislature*, No. 20A66, 2020 U.S. LEXIS 5187, at *13 (Oct. 26, 2020) (Kavanaugh, J., concurring in denial of application for stay) ("'[T]he design of

electoral procedures is a legislative task,' including during a pandemic.") (internal citation omitted).

9.      This case seeks to protect and vindicate fundamental rights.  It is a civil rights action brought under the Fourteenth Amendment to the United States Constitution, Article II, section 1 of the United States Constitution, and 42 U.S.C. § 1983.  Most important, this case seeks to restore the purity and integrity of elections in Michigan so that "We the people" can have confidence in their outcome and thus confidence that those who govern are doing so legitimately.

## JURISDICTION AND VENUE

10.      This action arises under the Constitution and laws of the United States.  Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331 and 1343.

11.      Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, by *Ex parte Young*, 209 U.S. 123 (1908), and by the general legal and equitable powers of this Court.

12.      Plaintiffs' claim for an award of their reasonable costs of litigation, including attorneys' fees and expenses, is authorized by 42 U.S.C. § 1988, and other applicable law.

13.      Venue is proper under 28 U.S.C. § 1391(b) because the Michigan Secretary of State and the Chair of the Board of State Canvassers for Michigan are located in this judicial district and all Defendants are residents of the State in which this district is located.

## PARTIES

14.      Plaintiff Angelic Johnson is an adult citizen of the United States and a resident of Macomb County, Michigan.  Plaintiff Johnson is a member of Black Voices for Trump.  She legally voted in the November 3, 2020 general election, and she was a poll challenger at the TCF Center.

- 4 -

15.    Plaintiff Sarah Stoddard is an adult citizen of the United States and a resident of Wayne County, Michigan.  She legally voted in the November 3, 2020 general election, and she was a poll challenger at the TCF Center.

16.    Defendant Jocelyn Benson is the Michigan Secretary of State.  As the Secretary of State, Defendant Benson is the State's "chief election officer" with supervisory control over local election officials in the performance of their election related duties, including supervisory control over the election officials and workers at the TCF Center.

17.    Jeannette Bradshaw is the Chair of the Board of State Canvassers for Michigan. The Board of State Canvassers ("Board") is responsible for certifying Michigan election results. The Board's certification gives rise to the winning presidential candidate's selection of the 16 Michigan electors.

## STATEMENT OF FACTS

18.    The general election was held on November 3, 2020, and approximately 850,000 votes were reported as cast in Wayne County, Michigan.  Wayne County is the most populous county in Michigan.

19.    The TCF Center contained 134 Absent Voter Counting Boards ("AVCBs"), and it was the only facility within Wayne County authorized to count ballots.

20.    Wayne County used the TCF Center in downtown Detroit to consolidate, collect, and tabulate all the ballots for the County.

### Summary of Election Malfeasance

21.    There were numerous issues of fraud and other illegal conduct occurring at the TCF Center and elsewhere during the November 3, 2020 general election.

22.    On election day, election officials at the TCF Center systematically processed and

counted ballots from voters whose names failed to appear in either the Qualified Voter File ("QVF") or in the supplemental sheets.  When a voter's name could not be found, the election worker assigned the ballot to a random name already in the QVF to a person who had not voted.

23.     On election day, election officials within Wayne County instructed election workers to not verify signatures on absentee ballots, to backdate absentee ballots, and to process such ballots regardless of their validity.

24.     After election officials announced the last absentee ballots had been received, another batch of unsecured and unsealed ballots arrived in trays at the TCF Center.

25.     There were tens of thousands, if not more, of these late-arriving absentee ballots, and apparently every ballot was counted and attributed only to Democratic candidates.

26.     Election officials at the TCF Center instructed election workers to process ballots that appeared after the election deadline and to falsely report that those ballots had been received before the November 3, 2020, deadline.

27.     Election officials at the TCF Center systematically used false information to process ballots.

28.     Many times, the election workers overrode the software by inserting new names into the QVF after the election and recording these new voters as having a birthdate of "1/1/1900," which is the "default" birthday.

29.     On a daily basis leading up to the election, City of Detroit election workers and employees coached voters to vote for Joe Biden and the Democratic Party.  These workers and employees encouraged voters to vote a straight Democratic Party ticket.  These election workers and employees went over to the voting booths with voters to watch them vote and to coach them as to which candidate they should vote for.

30.     Pamphlets promoting the Democratic Party were allowed within 100 feet, and even inside, the polls at the precincts within the City of Detroit.

31.     Before and after the statutory deadline, unsecured ballots arrived at the TCF Center loading garage, not in sealed ballot boxes and with no chain of custody.

32.     Election officials and workers at the TCF Center allowed ballots to be duplicated by hand without allowing poll challengers to check if the duplication was accurate.  In fact, election officials and workers repeatedly obstructed poll challengers from observing.  Election officials permitted thousands of ballots, if not more, to be filled out by hand and duplicated on site without oversight from poll challengers.

33.     After poll challengers started discovering the fraud taking place at the TCF Center, election officials and workers locked credentialed challengers out of the counting room so they could not observe the process, during which time tens of thousands of ballots, if not more, were processed.

### Suspicious Funding and Training of Election Workers

34.     On September 22, 2020, the Detroit City Council approved a $1 million contract for the staffing firm P.I.E. Management, LLC to hire up to 2,000 workers to work the polls and to staff the ballot counting at the TCF Center.  P.I.E. Management, LLC is owned and/or controlled by a Democratic Party operative.

35.     A week after the contract was approved, P.I.E. Management, LLC began advertising for workers, stating, "Candidates must be 16 years or older.  Candidates are required to attend a 3-hour training session before the General Election.  The position offers two shifts and pay-rates: 1) From 7 am to 7 pm at $600.00; and 2) From 10 pm to 6 am at $650."  Consequently, these temporary workers were earning at least $50 per hour.

**Forging Ballots on the QVF**

36.     Election officials were observed processing ballots at the TCF Center without confirming that the voter was eligible to vote.

37.     Election officials were observed assigning ballots to different voters, resulting in a ballot being counted for a non-eligible voter by assigning it to a voter in the QVF who had not yet voted.

**Changing Dates on Ballots**

38.     All absentee ballots that existed needed to be recorded by 9:00 p.m. on November 3, 2020.  This had to be finished in order to have a final list of absentee voters who returned their ballots prior to 8:00 p.m. on November 3, 2020.  To have enough time to process the absentee ballots, all polling locations were instructed to collect the absentee ballots from the drop-boxes once every hour on November 3, 2020.

39.     On November 4, 2020, a City of Detroit election worker at the TCF Center was instructed to improperly pre-date the received date for absentee ballots as if they had been received on or before November 3, 2020.  She was told to alter the information in the QVF to falsely show that the absentee ballots had been received in time to be valid.  She estimates that this was done to thousands of ballots.

**Double Voting**

40.     An election worker in the City of Detroit observed a large number of people who came to the polling place to vote in-person, but they had already applied for an absentee ballot. Election officials allowed these people to vote in-person, and they did not require them to return the mailed absentee ballot or sign an affidavit that the voter lost or "spoiled" the mailed absentee ballot.

41.     This would permit a person to vote in person and also to send in his/her absentee ballot, thereby voting twice.  This "double voting" was made possible by the fraudulent way in which election officials were counting and inputting ballots at the TCF Center.

42.     This "double voting" fraud was exacerbated by the Secretary of State's absentee ballot scheme, as set forth further in this Complaint.

**First Wave of New Ballots**

43.     At approximately 4:00 a.m. on November 4, 2020, tens of thousands of ballots, if not more, were suddenly brought into the counting room at the TCF Center through the back door.

44.     These new ballots were brought to the TCF Center by vehicles with out-of-state license plates.

45.     It was observed that all of these new ballots were cast for Joe Biden.

**Second Wave of New Ballots**

46.     The ballot counters were required to check every ballot to confirm that the name on the ballot matched the name on the electronic poll list—the list of all persons who had registered to vote on or before November 1, 2020 (the QVF).

47.     The ballot counters were also provided with supplemental sheets which had the names of all persons who had registered to vote on either November 2, 2020 or November 3, 2020.

48.     The validation process for a ballot requires the name on the ballot be matched with a registered voter on either the QVF or the supplemental sheets.

49.     At approximately 9:00 p.m. on Wednesday, November 4, 2020, numerous boxes of ballots were brought to the TCF Center.  This was a second wave of new ballots.

50.     Upon information and belief, election officials instructed the ballot counters to use the "default" date of birth of January 1, 1900, on all of these newly appearing ballots.

51.     None of the names on these new ballots corresponded with any registered voter on the QVF or the supplemental sheets.

52.     Despite election rules requiring all absentee ballots to be inputted into the QVF system before 9:00 p.m. on November 3, 2020, the election workers inputted all of these new ballots into the QVF, manually adding each voter to the list *after* 9:00 p.m.

53.     Upon information and belief, the vast majority of these new ballots were entered into the QVF using the "default" date of birth of January 1, 1900.

54.     These newly received ballots were either fraudulent or apparently cast by persons who were not registered to vote before the polls closed at 8:00 p.m. on November 3, 2020.

**Concealing the Malfeasance**

55.     Numerous election challengers were denied access to observe the counting process by election officials at the TCF Center.

56.     After denying access to the counting rooms, election officials at the TCF Center used large pieces of cardboard to block the windows to the counting room thereby preventing anyone from watching the ballot counting process.

**Unsecured QVF Access**

57.     Whenever an absentee voter application or in-person absentee voter registration was finished, election workers at the TCF Center were instructed to input the voter's name, address, and date of birth into the QVF system.

58.     The QVF system can be accessed and edited by any election processor with proper credentials in the State of Michigan at any time and from any location with Internet access.

59.     This access permits anyone with the proper credentials to edit when ballots were sent, received, and processed from any location with Internet access.

60.     Many of the counting computers within the counting room had icons that revealed that they were connected to the Internet.

**Unsecured Ballots**

61.     A poll challenger witnessed tens of thousands of ballots, and possibly more, being delivered to the TCF Center that were not in any approved, sealed, or tamper-proof container.

62.     Large quantities of ballots were delivered to the TCF Center in what appeared to be mail bins with open tops.  See the photo of the TCF Center below:



63.     These ballot bins and containers did not have lids, were not sealed, and did not have the capability of having a metal seal.

64.     Some ballots were found unsecured on the public sidewalk outside the Department of Elections in the City of Detroit, reinforcing the claim that boxes of ballots arrived at the TCF Center unsealed, with no chain of custody, and with no official markings.  A photograph of ballots found on the sidewalk outside of the Department of Elections appears below:



65.    The City of Detroit held a drive-in ballot drop off where individuals would drive up and drop their ballots into an unsecured tray.  No verification was done.  This was not a secured drop-box with video surveillance.  To encourage this practice, free food and beverages were provided to those who dropped off their ballots using this method.

### Breaking the Seal of Secrecy

66.    On multiple occasions, election officials at the TCF Center broke the seal of secrecy for ballots to check which candidates the individual voted for on his or her ballot, thereby violating the voter's expectation of privacy.

### Absentee Ballot Fraud

67.    Whenever a person requested an absentee ballot either by mail or in-person, that person was required to sign the absentee voter application.

68.    When the voter returned his/her absentee ballot to be counted, the voter was required to sign the outside of the envelope that contained the ballot.

69.    Election officials who process absentee ballots are required to compare the signature on the absentee ballot application with the signature on the absentee ballot envelope.

70.    Election officials at the TCF Center instructed workers not to validate or compare signatures on absentee ballot applications and absentee ballot envelopes to ensure their authenticity and validity.

71.    Michigan law requires absentee votes to be counted by election inspectors in a particular manner.  It requires, in relevant part:

> (10) The oaths administered under subsection (9) must be placed in an envelope provided for the purpose and sealed with the red state seal.  Following the election, the oaths must be delivered to the city or township clerk. Except as otherwise provided in subsection (12), a person in attendance at the absent voter counting place or combined absent voter counting place shall not leave the counting place after the tallying has begun until the polls close.  Subject to this subsection, the

clerk of a city or township may allow the election inspectors appointed to an absent voter counting board in that city or township to work in shifts.  A second or subsequent shift of election inspectors appointed for an absent voter counting board may begin that shift at any time on election day as provided by the city or township clerk.  However, an election inspector shall not leave the absent voter counting place after the tallying has begun until the polls close.  If the election inspectors appointed to an absent voter counting board are authorized to work in shifts, at no time shall there be a gap between shifts and the election inspectors must never leave the absent voter ballots unattended.  ***At all times, at least 1 election inspector from each major political party must be present at the absent voter counting place and the policies and procedures adopted by the secretary of state regarding the counting of absent voter ballots must be followed***.  A person who causes the polls to be closed or who discloses an election result or in any manner characterizes how any ballot being counted has been voted in a voting precinct before the time the polls can be legally closed on election day is guilty of a felony.

Mich. Comp. Laws § 168.765a (10) (emphasis added).

72.     Pursuant to § 168.31 of the Michigan election law, the Secretary of State can issue instructions and rules consistent with Michigan statutes and the Constitution that bind local election authorities.  Mich. Comp. Laws § 168.31.  Likewise, pursuant to § 168.765a(13) of the Michigan election law, the Secretary can develop instructions consistent with the law for the conduct of Absent Voter Counting Boards ("AVCB") or combined AVCBs.  "The instructions developed under [] subsection [13] are binding upon the operation of an absent voter counting board or combined absent voter counting board used in an election conducted by a county, city, or township."  Mich. Comp. Laws § 168.765a(13).

73.     The Secretary of State promulgated an election manual that requires the following:

*Each ballot rejected by the tabulator must be visually inspected by an election inspector to verify the reason for the rejection.  **If the rejection is due to a false read the ballot must be duplicated by two election inspectors who have expressed a preference for different political parties.**  Duplications may not be made until after 8 p.m. in the precinct (place the ballot requiring duplication in the auxiliary bin).  At an AV counting board duplications can be completed throughout the day. NOTE: The Bureau of Elections has developed a video training series that summarizes key election day management issues, including a video on Duplicating Ballots.  These videos can be accessed at the Bureau of Elections web site at*

- 13 -

*www.michigan.gov/elections; under "Information for Election Administrators";*
*Election Day Management Training Videos.* <u>Election Officials Manual</u>*, Michigan*
*Bureau of Elections, Chapter 8, last revised October 2020.*

https://www.michigan.gov/documents/sos/VIII_Absent_Voter_County_Boards_265998_7.pdf

(emphasis added).

74.     Election officials at the TCF Center flouted § 168.765a in that there was not, at all times, at least one inspector from each political party at the absentee voter counting place.  Rather, many tables were staffed by inspectors for only one party.  Those inspectors alone were making decisions regarding the processing and counting of ballots.

75.     This processing included the filling out of brand new "cure" or "duplicate" ballots. The process the election officials sanctioned worked in the following manner.  When an absentee ballot was processed and approved for counting, it was fed into a counting machine.  Some ballots were rejected—that is, they were a "false read"—because of tears, staining (such as coffee spills), over-votes, and other errors.  In some of these cases, inspectors could personally and visually inspect the rejected ballot and determine what was causing the machine to find a "false read." When this happened, the inspectors could duplicate the ballot, expressing the voter's intent in a new ballot that could then be fed into the machine and counted.

76.     Under § 168.765a and the Secretary of State's controlling manual, as cited above, an inspector from each major party must be present and must actually sign to show that they approve of the duplication.

77.     Rather than following this controlling mandate, the AVCB was allowing a Democratic Party inspector only to fill out a duplicate.  Republicans would sign only "if possible." A photograph evidencing this illicit process appears below:



78.     The TCF Center election officials allowed hundreds or thousands of ballots to be "duplicated" solely by the Democratic Party inspectors and then counted in violation of Michigan election law.

79.     According to eyewitness accounts, election officials at the TCF Center habitually and systematically disallowed election inspectors from the Republican Party to be present in the voter counting place and refused access to election inspectors from the Republican Party to be within a close enough distance from the absentee voter ballots to see for whom the ballots were cast.

80.     Election officials at the TCF Center refused entry to official election inspectors from the Republican Party into the counting place to observe the counting of absentee voter ballots.  Election officials even physically blocked and obstructed election inspectors from the Republican Party by adhering large pieces of cardboard to the transparent glass doors so the counting of absent voter ballots was not viewable.

81.     Absentee ballots from military members, who tend to vote Republican in the general elections, were counted separately at the TCF Center.  These ballots were supposed to be the last ones counted, but there was another large drop of ballots that occurred during the counting of the military absentee ballots.  All (100%) of the military absentee ballots had to be duplicated

by hand because the form of the ballot was such that election workers could not run it through the tabulation machines used at the TCF Center.  The military absentee ballot count at the TCF Center occurred when the Republican challengers and poll watchers were kicked out of the counting room.

82.     Michigan election law (Mich. Comp. Laws §168.765(5)), requires City Clerks to post the following absentee voting information anytime an election is conducted which involves a State or federal office:

> a.     The clerk must post before 8:00 a.m. on Election Day: 1) the number of absent voter ballots distributed to absent voters 2) the number of absent voter ballots returned before Election Day and 3) the number of absent voter ballots delivered for processing.
> b.     The clerk must post before 9:00 p.m. on Election Day: 1) the number of absent voter ballots returned on Election Day 2) the number of absent voter ballots returned on Election Day which were delivered for processing 3) the total number of absent voter ballots returned both before and on Election Day and 4) the total number of absent voter ballots returned both before and on Election Day which were delivered for processing.
> c.     The clerk must post immediately after all precinct returns are complete: 1) the total number of absent voter ballots returned by voters and 2) the total number of absent voter ballots received for processing.

83.     Upon information and belief, the clerk for the City of Detroit failed to post by 8:00 a.m. on "Election Day" the number of absentee ballots distributed to absent voters and failed to post before 9:00 p.m. the number of absent voter ballots returned both before and on "Election Day."

84.     According to Michigan Election law, all absentee voter ballots must be returned to the clerk before polls close at 8 p.m.  Mich. Comp. Laws § 168.764a.  Any absentee voter ballots received by the clerk after the close of the polls on election day should not be counted.

85.     Michigan allows for early counting of absentee votes before the closings of the polls for large jurisdictions, such as the City of Detroit and Wayne County.

86.     Poll challengers observed election workers and supervisors writing on ballots

themselves to alter them, apparently manipulating spoiled ballots by hand and then counting the ballots as valid, counting the same ballot more than once, adding information to incomplete affidavits accompanying absentee ballots, counting absentee ballots returned late, counting unvalidated and unreliable ballots, and counting the ballots of "voters" who had no recorded birthdates and were not registered in the QVF or in any supplemental sheets.

87.     Upon information and belief, receiving tens of thousands more absentee ballots in the early morning hours after election day and after the counting of the absentee ballots had concluded, without proper oversight, with tens of thousands of ballots attributed to just one candidate, Joe Biden, confirms that election officials failed to follow proper election protocols and Michigan election law.

### Flooding the Election with Absentee Ballots

88.     Michigan does not permit "mail-in" ballots *per se*, and for good reason: mail-in ballots facilitate fraud and dishonest elections.  *See, e.g., Veasey v. Abbott*, 830 F.3d 216, 256, 263 (5th Cir. 2016) (observing that "mail-in ballot fraud is a significant threat—unlike in-person voter fraud," and comparing "in-person voting—a form of voting with little proven incidence of fraud" with "mail-in voting, which the record shows is far more vulnerable to fraud").

89.     Nonetheless, Defendant Benson's absentee ballot scheme, as set forth in this Complaint, achieved the same purpose as mail-in ballots, contrary to Michigan law.  Moreover, this scheme was put in place because it was understood that Republican voters were more likely to vote in-person by large numbers.  To counter this, Defendant Benson had to create a scheme to permit mail-in voting, resulting in the challenged absentee ballot scheme which favored Democratic voters over Republican voters.

90.     In her letter accompanying her absentee ballot scheme, Defendant Benson stated,

"You have the right to vote by mail in every election."  Playing on the fears created by the current pandemic, Defendant Benson encouraged voting "by mail," stating, "During the outbreak of COVID-19, it also enables you to stay home and stay safe while still making your voice heard in our elections."

91.     The Michigan legislature set forth detailed requirements for absentee ballots, and these requirements are necessary to prevent voter fraud because it is far easier to commit fraud via an absentee ballot than when voting in person.  *See, e.g., Griffin v. Roupas*, 385 F.3d 1128, 1130-31 (7th Cir. 2004) ("Voting fraud is a serious problem in U.S. elections generally . . . and it is facilitated by absentee voting").  Michigan law specifically provides the following:

> (1) Subject to section 761(3), at any time during the 75 days before a primary or special primary, but not later than 8 p.m. on the day of a primary or special primary, *an elector may apply for an absent voter ballot.  The elector <u>shall</u> apply in person or by mail* with the clerk of the township or city in which the elector is registered. The clerk of a city or township shall not send by first-class mail an absent voter ballot to an elector after 5 p.m. on the Friday immediately before the election. Except as otherwise provided in section 761(2), the clerk of a city or township shall not issue an absent voter ballot to a registered elector in that city or township after 4 p.m. on the day before the election.  An application received before a primary or special primary may be for either that primary only, or for that primary and the election that follows.  An individual may submit a voter registration application and an absent voter ballot application at the same time if applying in person with the clerk or deputy clerk of the city or township in which the individual resides. Immediately after his or her voter registration application and absent voter ballot application are approved by the clerk or deputy clerk, the individual may, subject to the identification requirement in section 761(6), complete an absent voter ballot at the clerk's office.
>
> (2) Except as otherwise provided in subsection (1) and subject to section 761(3), at any time during the 75 days before an election, but not later than 8 p.m. on the day of an election, *an elector may apply for an absent voter ballot.  The elector <u>shall</u> apply in person or by mail with the clerk of the township, city, or village in which the voter is registered*.  The clerk of a city or township shall not send by first-class mail an absent voter ballot to an elector after 5 p.m. on the Friday immediately before the election.  Except as otherwise provided in section 761(2), the clerk of a city or township shall not issue an absent voter ballot to a registered elector in that city or township after 4 p.m. on the day before the election.  An individual may submit a voter registration application and an absent voter ballot application at the same time if applying in person with the clerk or deputy clerk of the city or township

- 18 -

in which the individual resides.  Immediately after his or her voter registration application and absent voter ballot application are approved by the clerk, the individual may, subject to the identification requirement in section 761(6), complete an absent voter ballot at the clerk's office.

(3) An application for an absent voter ballot under this section may be made in any of the following ways:

(a) By *a written request **signed** by the voter*.

(b) On an absent voter ballot application form *provided for that purpose by the clerk of the city or township*.

(c) On a federal postcard application.

(4) *An applicant for an absent voter ballot **shall sign** the application*.  Subject to section 761(2), *a clerk or assistant clerk <u>shall not</u> deliver an absent voter ballot to an applicant <u>who does not sign the application</u>*.  A person shall not be in possession of a signed absent voter ballot application except for the applicant; a member of the applicant's immediate family; a person residing in the applicant's household; a person whose job normally includes the handling of mail, but only during the course of his or her employment; a registered elector requested by the applicant to return the application; or a clerk, assistant of the clerk, or other authorized election official.  A registered elector who is requested by the applicant to return his or her absent voter ballot application shall sign the certificate on the absent voter ballot application.

(5) The clerk of a city or township shall have absent voter ballot application forms *available in the clerk's office* at all times and shall furnish an absent voter ballot application form to anyone *upon a verbal or written request*.

Mich. Comp. Laws § 168.759 (emphasis added).

92.     The Secretary of State's absentee ballot scheme led to the Secretary of State sending millions of absentee ballot requests to individuals who did *not* request them.  The Secretary of State sent absentee ballot requests to every household in Michigan with a registered voter, no matter if the voter was still alive or actually resided at that address.  The Secretary of State also sent absentee ballot requests to non-residents who were temporarily living in Michigan, such as students who were not registered voters in Michigan.

93.     Moreover, the Secretary of State's absentee ballot scheme permitted individuals to request absentee ballots online and without the required signature of the requestor.

94.     As a result of the absentee ballot scheme, and as the Secretary of State intended, the election process was flooded with absentee ballots, many of which were fraudulent.

- 19 -

95.     The Secretary of State's absentee ballot scheme invited the fraudulent use of absentee ballots and promoted such illicit practices as ballot harvesting.

96.     The Secretary of State's absentee ballot scheme violated the checks and balances put in place by the Michigan legislature to ensure the integrity and purity of the absentee ballot process and thus the integrity and purity of the 2020 general election.

97.     The abuses permitted by the Secretary of State's ballot scheme were on full display at the TCF Center, and because this absentee ballot scheme applied statewide, it undermined the integrity and purity of the general election statewide.

**Irreparable Harm to Plaintiffs and All Legal Voters**

98.     Plaintiffs voted for the Republican Party candidates during the 2020 general election.  Specifically, Plaintiffs voted for Donald J. Trump for President and John James for the United States Senate.  But for the unlawful acts set forth in this Complaint, President Trump would have won Michigan's 16 electoral votes and John James would have been elected to the United States Senate, thereby promoting Plaintiffs' political interests.

99.     The unlawful acts set forth in this Complaint have caused, and will continue to cause, Plaintiffs irreparable harm.

100.     Based on the above allegations of fraud, statutory violations, and other misconduct, it is necessary to order appropriate relief, including, but not limited to, enjoining the certification of the election results pending a full and independent investigation, ordering a recount of the election results, voiding the election and ordering a new election as permitted by law, or voiding the illicit absentee ballots to remedy the fraud.

101.     Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm unless the injunctive relief requested here is granted.

## FIRST CLAIM FOR RELIEF

### (Due Process—Fourteenth Amendment)

102.    Plaintiffs hereby incorporate by reference all stated paragraphs.

103.    By reason of the aforementioned acts, policies, practices, procedures, and/or customs, created, adopted, and enforced under color of State law, Defendants have deprived Plaintiffs of the right to due process guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

104.    The right of qualified citizens to vote in a State election involving federal candidates is recognized as a fundamental right under the Fourteenth Amendment. *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 665 (1966); *see also Reynolds*, 377 U.S. at 554 (["The Fourteenth Amendment protects the] the right of all qualified citizens to vote, in state as well as in federal elections.").

105.    The fundamental right to vote protected by the Fourteenth Amendment is cherished in our nation because it "is preservative of other basic civil and political rights." *Reynolds*, 377 U.S. at 562.

106.    Voters have a right to cast a ballot in an election free from the taint of intimidation and fraud, and confidence in the integrity of our electoral processes is essential to the functioning of our constitutional republic.

107.    Included within the right to vote, secured by the Constitution, is the right of qualified voters within a State to cast their ballots and have them counted if they are validly cast. The right to have the vote counted means counted at full value without dilution or discount.

108.    Every voter in a federal election, whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes.

109.    Invalid or fraudulent votes debase and dilute the weight of each validly cast vote.

110.    The right to an honest count is a right possessed by each voting elector, and to the extent that the importance of his vote is nullified, wholly or in part, he has been injured in the free exercise of a right or privilege secured to him by the laws and Constitution of the United States.

111.    Practices that promote the casting of illegal or unreliable ballots, or fail to contain basic minimum guarantees against such conduct, such as the Secretary of State's absentee ballot scheme, can violate the Fourteenth Amendment by leading to the dilution of validly cast ballots. *See Reynolds*, 377 U.S. at 555 ("[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.").

112.    The Due Process Clause of the Fourteenth Amendment protects the right to vote from conduct by State officials which undermines the fundamental fairness of the electoral process.

113.    Separate from the Equal Protection Clause, the Fourteenth Amendment's Due Process Clause protects the fundamental right to vote against the disenfranchisement of a State electorate.

114.    When an election process reaches the point of patent and fundamental unfairness, as in this case, there is a due process violation.

115.    As a result, the right to vote, the right to have one's vote counted and the right to have one's vote given equal weight are basic and fundamental constitutional rights incorporated in the Due Process Clause of the Fourteenth Amendment.

116.    Defendants have a duty to guard against the deprivation of the right to vote through the dilution of validly cast ballots by ballot fraud or election tampering.  The Secretary of State failed in her duty, and if the Board of State Canvassers certifies the 2020 general election, it will have failed in its duty.

117.    The actions of election officials and the Secretary of State's absentee ballot scheme have caused the debasement and dilution of the weight of Plaintiffs' votes in violation of the Due Process Clause of the Fourteenth Amendment.

118.    As a direct and proximate result of Defendants' violation of the Due Process Clause, Plaintiffs have suffered irreparable harm, including the loss of their fundamental constitutional rights, disparate treatment, and dilution of their lawful votes, entitling them to declaratory and injunctive relief.

## SECOND CLAIM FOR RELIEF

### (Equal Protection—Fourteenth Amendment)

119.    Plaintiffs hereby incorporate by reference all stated paragraphs.

120.    By reason of the aforementioned acts, policies, practices, procedures, and/or customs, created, adopted, and enforced under color of State law, Defendants have deprived Plaintiffs of the equal protection of the law guaranteed under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

121. The actions of election officials and the Secretary of State's absentee ballot scheme have caused the debasement and dilution of the weight of Plaintiffs' votes in violation of the equal protection guarantee of the Fourteenth Amendment.

122. As a direct and proximate result of Defendants' violation of the Equal Protection Clause, Plaintiffs have suffered irreparable harm, including the loss of their fundamental constitutional rights, disparate treatment, and dilution of their lawful votes, entitling them to declaratory and injunctive relief.

### THIRD CLAIM FOR RELIEF

### (Article II, section 1, clause 2)

123. Plaintiffs hereby incorporate by reference all stated paragraphs.

124. By reason of the aforementioned absentee ballot scheme created, adopted, and enforced by the Secretary of State under color of State law and without legislative authorization, Defendant Benson violated Article II, section 1, clause 2 of the United States Constitution and 42 U.S.C. § 1983.

125. As a direct and proximate result of Defendant Benson's violation of the United States Constitution, Plaintiffs have suffered irreparable harm, including the loss of their fundamental constitutional rights, disparate treatment, and dilution of their lawful votes, entitling them to declaratory and injunctive relief.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs ask this Court:

A) to declare that Defendants violated Plaintiffs' fundamental constitutional rights as set forth in this Complaint;

B) to declare the Secretary of State's absentee ballot scheme unlawful;

C)      to enjoin Defendants from finally certifying the election results and declaring winners of the 2020 general election until an independent audit to ensure the accuracy and integrity of the election is performed.  To perform the audit, Plaintiffs request the appointment of a special master to investigate all claims of fraud in Wayne County, specifically including claims of fraud at the TCF Center, and to verify and certify the legality of all absentee ballots ordered through the Secretary of State's absentee ballot scheme throughout the State.  The special master may issue a recommendation, including a recommendation with findings that illegal votes can be separated from legal votes to determine a proper tabulation, or that the fraud is of such a character that the correct vote cannot be determined;

D)      alternatively, to enjoin Defendants from finally certifying the election results and declaring winners of the 2020 general election until a special master can be appointed to review and certify the legality of all absentee ballots ordered through the Secretary of State's absentee ballot scheme;

E)      alternatively, to enjoin Defendants from finally certifying the election results and declaring winners of the 2020 general election until a special master can be appointed to independently review the election procedures employed at the TCF Center;

F)      alternatively, to enjoin Defendants from finally certifying the election results and declaring winners of the 2020 general election until a special master can be appointed to review and certify the legality of all absentee ballots submitted in Wayne County;

G)      to award Plaintiffs their reasonable attorney fees, costs, and expenses pursuant to 42 U.S.C. § 1988 and other applicable law;

H)      to grant such other and further relief as this Court should find just and proper.

Respectfully submitted,

AMERICAN FREEDOM LAW CENTER

/s/ *Robert J. Muise*
Robert J. Muise, Esq. (P62849)
PO Box 131098
Ann Arbor, Michigan 48113
Tel: (734) 635-3756
Fax: (801) 760-3901
rmuise@americanfreedomlawcenter.org

/s/ *Ian A. Northon*
Ian A. Northon, Esq. (P65082)
RHOADES MCKEE PC
55 Campau Avenue NW #300
Grand Rapids, Michigan 49503
Tel.: (616) 233-5125
Fax: (616) 233-5269
ian@rhoadesmckee.com
smd@rhoadesmckee.com

/s/ *Erin Elizabeth Mersino*
Erin Elizabeth Mersino, Esq. (P70886)
GREAT LAKES JUSTICE CENTER
5600 W. Mt. Hope Highway
Lansing, Michigan 48917
Tel: (517) 322-3207
Fax: (517) 322-3208
erin@greatlakesjc.org

*Special Counsel for Thomas More Society*

*Attorneys for Plaintiffs*