# EXHIBIT 2

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| ANGELIC JOHNSON and SARAH STODDARD,<br><br>                   Plaintiffs,<br><br>    v.<br><br>JOCELYN BENSON, in her official capacity as Michigan Secretary of State; and JEANNETTE BRADSHAW, in her official capacity as Chair of the Board of State Canvassers for Michigan,<br><br>                   Defendants. | CIVIL ACTION<br><br>Case No. 1:20-cv-01098-JTN-PJG<br><br>Hon. Janet T. Neff |

## PROPOSED INTERVENOR-DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT

# TABLE OF CONTENTS

CONCISE STATEMENT OF REASONS .......................................................................... ii

I.    INTRODUCTION ............................................................................................... 1

II.   BACKGROUND .................................................................................................. 2

   A.   State Court Lawsuits ..................................................................................... 2

   B.   Plaintiffs' Complaint ..................................................................................... 5

III.  LEGAL STANDARD .......................................................................................... 6

IV.   ARGUMENT ....................................................................................................... 7

   A.   Principles of federalism and comity strongly favor abstention. .................... 7

   B.   The Eleventh Amendment bars Plaintiffs' claims. ...................................... 11

   C.   Plaintiffs lack standing. .............................................................................. 14

      1.   Plaintiffs do not allege harms sufficient to satisfy Article III standing. ...... 15

      2.   Plaintiffs' lack prudential standing to bring Count III. ............................... 16

   D.   Plaintiffs' claims are barred by the equitable doctrine of laches. ................. 17

   E.   Plaintiffs fail to state a claim on which relief can be granted. ..................... 20

      1.   Plaintiffs' claims are not plausible. ............................................................. 20

      2.   Plaintiffs have not pleaded a viable due process claim. ............................... 21

      3.   Plaintiffs have not pleaded a viable equal protection claim. ........................ 25

      4.   Plaintiffs have not pleaded a viable Electors Clause claim. ......................... 27

   F.   Plaintiffs are not entitled to the relief they seek. ....................................... 30

V.    CONCLUSION .................................................................................................. 32

**CONCISE STATEMENT OF REASONS**

1.      This Court should abstain in deference to ongoing state court proceedings.

2.      The Eleventh Amendment bars Plaintiffs' claims because this Court cannot require state

officials to conform to state law.

3.      Plaintiffs lack both Article III and prudential standing to bring their claims.

4.      Plaintiffs' claims are barred by the equitable doctrine of laches.

5.      Plaintiffs' claims fail as a matter of law.

## I.     INTRODUCTION

In the two weeks following election day, various groups and individuals—unwilling to accept President-elect Joe Biden's victory in Michigan—have filed baseless lawsuits to cast doubt on the election's legitimacy. In this action, Plaintiffs ask the Court to delay the lawful certification of Michigan's returns, and therefore imperil the votes of more than 5.5 million Michiganders, based on recycled and entirely unsupported allegations of electoral malfeasance. They also seek to invalidate the State's absentee ballot process in its entirety—*after* Defendants and Michigan voters relied on that process for months and the State successfully administered the election using it.

This Court should dismiss Plaintiffs' complaint for several reasons. First, it should abstain from hearing this case in deference to ongoing state court proceedings implicating the same issues and allegations Plaintiffs raise here—including a state court case brought by Plaintiff Sarah Stoddard. Second, the Eleventh Amendment prohibits Plaintiffs' suit because a federal court cannot require state officials to conform to state law. Third, Plaintiffs' claims—challenging actions that took place months and weeks ago—are barred by laches, a doctrine carrying particular force in the election context. Fourth, Plaintiffs lack Article III standing to bring their claims, and further lack prudential standing to assert the Michigan Legislature's interests. Each of these jurisdictional bars precludes this Court's adjudication of Plaintiffs' suit.

Moreover, Plaintiffs' claims fail as a matter of law. They have not stated cognizable due process and equal protection claims, and their Electors Clause claim fails because Defendant Jocelyn Benson, the Secretary of State (the "Secretary"), acted consistently with the Michigan Legislature's electoral scheme—as the Michigan Court of Appeals already held, nothing in Michigan law prohibits the Secretary from providing voters with unsolicited absentee ballot

applications. *See Davis v. Sec'y of State*, No. 354622, 2020 WL 5552822, at *7 (Mich. Ct. App. Sept. 16, 2020). Finally, Plaintiffs' requested relief—an extraordinary judicial intervention into the State's democratic process—is neither justified by their claims nor proportionate to their purported injuries. Dismissal is therefore required.

Ultimately, Plaintiffs' lawsuit is empty political theater, part of a broader and deeply troubling national effort to use the judiciary to cast doubt on the outcome of the presidential election. Having failed to secure favorable rulings in state court, Plaintiffs turn to this forum with the same meritless claims. Every other court confronted with these efforts has properly rejected them. This Court should do the same and dismiss Plaintiffs' complaint.

## II.    BACKGROUND

On November 3, 2020, Michiganders went to the polls and voted for President-elect Biden by a statewide margin of 2.6 percent. In Wayne County, approximately 850,000 voters cast ballots. *See* Compl., ECF No. 1, ¶ 18.

### A.    State Court Lawsuits

Over the subsequent two weeks, various challenges to Michigan's election procedures and results have been filed in state (and federal) courts. One such case was brought in state court by Plaintiff Stoddard. There, Ms. Stoddard sought to delay certification of Wayne County's election results based on many of the same allegations she rehashes here. *See* Verified Compl. for Emergency & Permanent Injunctive Relief, *Stoddard v. City Election Comm'n*, No. 20-014604-CZ (Mich. Cir. Ct. Nov. 4, 2020) (attached as Ex. 7); First Am. Verified Compl. for Emergency & Permanent Injunctive Relief, *Stoddard v. City Election Comm'n*, No. 20-014604-CZ (Mich. Cir.

Ct. Nov. 5, 2020) (attached as Ex. 8).[1] On November 6, the Third Judicial Circuit Court for Wayne County denied Ms. Stoddard's motion for injunctive relief. Chief Judge Timothy M. Kenny explained,

> This Court finds that it is mere speculation by plaintiffs that hundreds or thousands of ballots have, in fact, been changed and presumably falsified. . . .
>
> A delay in counting and finalizing the votes from the City of Detroit without any evidentiary basis for doing so, engenders a lack of confidence in the City of Detroit to conduct full and fair elections. The City of Detroit should not be harmed when there is no evidence to support accusations of voter fraud.

*Stoddard v. City Election Comm'n*, No. 20-014604-CZ, slip op. at 4 (Mich. Cir. Ct. Nov. 6, 2020) (attached as Ex. 9).

Other similar challenges have likewise been rejected. On election day, the Michigan Court of Claims denied an emergency motion to increase the number of challengers at the Oakland County vote center. *See Polasek-Savage v. Benson*, No. 20-000217-MM, slip op. at 3 (Mich. Ct. Cl. Nov. 3, 2020) (attached as Ex. 10). The following day, Donald J. Trump for President, Inc. (the "Trump Campaign") filed an emergency motion for declaratory relief seeking an immediate cessation of absentee ballot counting based on allegations of insufficient oversight. *See* Verified Compl. for Immediate Declaratory & Injunctive Relief, *Donald J. Trump for President, Inc. v. Benson*, No. 20-000225-MZ (Mich. Ct. Cl. Nov. 4, 2020) (attached as Ex. 11). The Michigan Court of Claims denied the motion, concluding that the Trump Campaign was unlikely to succeed on the merits and that, even "overlooking the problems with the factual and evidentiary record," the

---

[1] "When considering whether to grant a Rule . . . 12(b)(6) motion," the Court may consider "matters of public record (e.g. pleadings, orders and other papers on file in another action pending in the court; records or reports of administrative bodies; or the legislative history of laws, rules or ordinances) as long as the facts noticed are not subject to reasonable dispute." *Lozar v. Birds Eye Foods, Inc.*, 678 F. Supp. 2d 589, 599 (W.D. Mich. 2009) (quoting *Pakootas v. Teck Cominco Metals, Ltd.*, 632 F. Supp. 2d 1029, 1032 (E.D. Wash. 2009)).

matter was moot. *Donald J. Trump for President, Inc. v. Benson*, No. 20-000225-MZ, slip op. at 5 (Mich. Ct. Cl. Nov. 6, 2020) (attached as Ex. 12). The Trump Campaign has since sought an appeal, *see* Mot. for Immediate Consideration of Appeal Under MCR 7.211(C)(6), *Donald J. Trump for President, Inc. v. Benson*, No. 355378 (Mich. Ct. App. Nov. 6, 2020) (attached as Ex. 13), but has failed to correct numerous filing defects as requested by the Michigan Court of Appeals over a week ago, *see* Appellate Docket Sheet, *Donald J. Trump for President, Inc. v. Benson*, No. 355378 (Mich. Ct. App.) (attached as Ex. 14).[2]

On November 13, the Third Judicial Circuit Court denied a motion for preliminary injunction in another challenge to Wayne County's returns. *See Costantino v. City of Detroit*, No. 20-014780-AW, slip op. at 13 (Mich. Cir. Ct. Nov. 13, 2020) (attached as Ex. 16). After reviewing the plaintiffs' affidavits and explaining why their vague allegations of suspicious conduct at TCF Center were unreliable, Chief Judge Kenny concluded that the "[p]laintiffs' interpretation of events is incorrect and not credible." *Id.* at 2–10, 13. He then observed that

> [i]t would be an unprecedented exercise of judicial activism for this Court to stop the certification process of the Wayne County Board of Canvassers. . . .
>
> Waiting for the Court to locate and appoint an independent, nonpartisan auditor to examine the votes, reach a conclusion and then finally report to the Court would involve untold delay. It would cause delay in establishing the Presidential vote tabulation, as well as all other County and State races. It would also undermine faith in the Electoral System.

---

[2] The Trump Campaign has raised similar claims in another recently filed action in this Court. *See* Compl. for Declaratory, Emergency, & Permanent Injunctive Relief, *Donald J. Trump for President, Inc. v. Benson*, No. 1:20-cv-01083-JTN-PJG (W.D. Mich. Nov. 11, 2020), ECF No. 1. Another group of voter plaintiffs also brought an action in this Court that raised a vote-dilution claim similar to Plaintiffs' claim, only to voluntarily dismiss it days later. *See* Notice of Voluntary Dismissal, *Bally v. Whitmer*, No. 1:20-cv-01088-JTN-PJG (W.D. Mich. Nov. 16, 2020), ECF No. 14.

*Id.* at 11–12. The Michigan Court of Appeals later denied the plaintiffs' motion for peremptory reversal and application for leave to appeal the circuit court's order, *see Costantino v. City of Detroit*, No. 355443 (Mich. Ct. App. Nov. 16, 2020) (attached as Ex. 17), and the plaintiffs have sought review before the Michigan Supreme Court, *see* Pls./Appellants' Appl. for Leave to Appeal, *Costantino v. City of Detroit*, No. 162245 (Mich. Nov. 17, 2020) (attached as Ex. 18).

These actions remain ongoing.[3]

## B.    Plaintiffs' Complaint

Plaintiffs initiated their lawsuit on November 15—six months after the Secretary's announcement that absentee ballot applications would be distributed ahead of the November election, twelve days after election day, and ten days after the conclusion of vote tabulation in Michigan. Their complaint is premised on two general allegations: that the Secretary "act[ed] unilaterally and without legislative approval" when she proactively distributed absentee ballot applications to Michigan households, Compl. ¶¶ 4, 88–90, and that "[t]here were numerous issues of fraud and other illegal conduct occurring at the TCF Center and elsewhere during the . . .

---

[3] Similar lawsuits challenging President-elect Biden's victories in other states have been brought and rejected by courts. Some featured equal protection claims similar to Plaintiffs' claims here. *See generally, e.g., Bognet v. Sec'y of Commonwealth*, No. 20-3214, 2020 WL 6686120 (3d Cir. Nov. 13, 2020) (affirming district court's denial of preliminary relief based on equal protection claim premised on vote dilution by purportedly illegal ballots); *Stokke v. Cegavske*, No. 2:20-cv-02046-APG-DJA (D. Nev. Nov. 6, 2020), ECF No. 27 (denying plaintiffs' motion for preliminary relief to halt ballot counting in Nevada); *Donald J. Trump for President, Inc. v. Phila. Cnty. Bd. of Elections*, No. 2:20-CV-05533-PD (E.D. Pa. Nov. 5, 2020), ECF No. 5 (denying Trump Campaign's emergency motion to stop Philadelphia County Board of Elections from counting ballots); *In re Enf't of Election Laws & Securing Ballots Cast or Received After 7:00 P.M. on Nov. 3, 2020*, No. SPCV2000982-J3 (Ga. Super. Ct. Nov. 5, 2020) (denying Trump Campaign's petition to segregate certain ballots and noting that "there is no evidence the ballots referenced in the petition [were invalid]" and "there is no evidence that the [county election officials] failed to comply with the law") (attached as Ex. 20); *Kraus v. Cegavske*, No. 20 OC 00142 1B (Nev. Dist. Ct. Oct. 29, 2020) (denying Trump Campaign's challenge to vote-tabulation observation procedures and finding no evidence of fraud) (attached as Ex. 21).

election," *id.* ¶¶ 21–87. From these two general allegations, Plaintiffs derive three claims: Count I, which alleges that "Defendants have deprived Plaintiffs of the right to due process guaranteed by the Due Process Clause of the Fourteenth Amendment" by denying them the "right to cast a ballot in an election free from the taint of intimidation and fraud," *id.* ¶¶ 102–18; Count II, which claims that "[t]he actions of election officials and the Secretary of State's absentee ballot scheme have caused the debasement and dilution of the weight of Plaintiffs' votes in violation of the equal protection guarantee of the Fourteenth Amendment," *id.* ¶¶ 119–22; and Count III, which alleges that the Secretary's distribution of absentee ballot applications violated the Electors Clause of the U.S. Constitution, *id.* ¶¶ 123–25.

### III.    LEGAL STANDARD

Whether a party has Article III standing is a question of a court's subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). *See Lyshe v. Levy*, 854 F.3d 855, 857 (6th Cir. 2017). "[W]here subject matter jurisdiction is challenged under Rule 12(b)(1)[,] . . . the plaintiff has the burden of proving jurisdiction in order to survive the motion." *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996) (emphasis omitted) (quoting *Rogers v. Stratton Indus., Inc.*, 798 F.2d 913, 915 (6th Cir. 1986)).

When considering a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court presumes that all well-pleaded material allegations in the complaint are true, *see Total Benefits Plan. Agency v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008), but "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (quoting Fed. R. Civ.

P. 8(a)). Courts need not accept as true legal conclusions or unwarranted factual inferences. *See Total Benefits Plan.*, 552 F.3d at 434.

## IV.    ARGUMENT

### A.    Principles of federalism and comity strongly favor abstention.

At the outset, the Court need not reach the merits of Plaintiffs' claims to dismiss this lawsuit. Under well-established abstention principles, Plaintiffs' challenge to Michigan's administration of its election should proceed in state court. Plaintiffs seek to bypass both state law remedies—which are designed to address the types of election grievances Plaintiffs raise here— *and* unfavorable rulings in ongoing state court proceedings. The relief Plaintiffs seek calls for an extraordinary intrusion on state sovereignty by a federal court, and principles of federalism and comity counsel strongly in favor of, and may well require, adjudication of these claims through the well-established state law procedures for election contests. *See González-Cancel v. Partido Nuevo Progresista*, 696 F.3d 115, 120 (1st Cir. 2012) ("Where, as here, a plaintiff is aware of, yet fails to fully use, an adequate state administrative or judicial process to address a local election dispute, a claim that the election process created fundamental unfairness to warrant federal intervention cannot survive."); *see also Costantino*, slip op. at 10–12 (describing remedies under Michigan law for election challenges) (attached as Ex. 16).

Under the abstention doctrine set forth in *Railroad Commission v. Pullman Co.*, 312 U.S. 496 (1941), federal courts should "avoid exercising jurisdiction in cases involving an ambiguous state statute that may be interpreted by state courts so as to eliminate, or at least alter materially, the constitutional question raised in federal court." *Lawrence v. Pelton*, 413 F. Supp. 3d 701, 709 (W.D. Mich. 2019) (quoting *Fowler v. Benson*, 924 F.3d 247, 255 (6th Cir. 2019)). This doctrine "acknowledges that federal courts should avoid the unnecessary resolution of federal constitutional

issues and that state courts provide the authoritative adjudication of questions of state law." *Brown v. Tidwell*, 169 F.3d 330, 332 (6th Cir. 1999) (quoting *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 508 (1985)). Abstention thus reflects the federal judiciary's "scrupulous regard for the rightful independence of the state governments," *Pullman*, 312 U.S. at 501, and is appropriate if the Court finds that (1) "state law is unclear," and (2) "a clarification of that law would preclude the need to adjudicate the federal question," *Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 233 (6th Cir. 2011). Both requirements are easily met here.

*First*, Plaintiffs' federal constitutional claims center on unresolved questions of state law. The complaint itself describes various provisions of the Michigan Compiled Laws. *See* Compl. ¶¶ 71–72, 82, 84, 91. Plaintiffs contend that the Secretary exceeded her authority by "chang[ing] or alter[ing] the election procedures established by the State legislature," *id.* ¶¶ 4–8, and that "[t]here were numerous issues of fraud and other illegal conduct occurring at the TCF Center and elsewhere during the November 3, 2020 general election," *id.* ¶ 21. Plaintiffs' allegations, at bottom, assert purported violations of Michigan's Election Code by the Secretary and local officials. Whether such violations occurred is a question of state law that a state court should adjudicate. As noted above, *these very same issues* are currently being litigated in state court, including by one of the Plaintiffs in this case.

*Second*, clarification of these state law issues would preclude the need to adjudicate the federal questions in this case. Indeed, with respect to Plaintiffs' Electors Clause claim, a state court has already provided clarification; the Michigan Court of Appeals held that "the authority and discretion afforded the Secretary of State by the constitution and state law permit defendant to send unsolicited absent voter ballot applications to all Michigan qualified registered voters." *Davis*, 2020 WL 5552822, at *7. Numerous other cases that allege near-identical instances of

fraud—on which Plaintiffs' due process and equal protection claims are premised—are pending in state court. If these state courts definitively interpret Michigan law, enforce state law procedures for adjudicating challenges to election results, and address the other questions Plaintiffs raise, then there would be nothing left for this Court to decide. Indeed, in the absence of a higher court decision, the decisions in *Davis*, *Stoddard*, *Costantino*, and *Trump* are dispositive and suggest that it is highly likely that any additional resolution of the state law questions will also be in Defendants' favor. *See West v. AT&T Co.*, 311 U.S. 223, 236–37 (1940) (federal courts are "not free to reject" rules of decision issued by state courts "merely because it has not received the sanction of the highest state court"). If Plaintiffs are incorrect that the alleged conduct violates Michigan law—*as state courts have already concluded*—then their claims cannot succeed.

In short, allowing Michigan courts to interpret these state law questions "may obviate the federal claims" and "eliminate the need to reach the federal question," and this Court should therefore abstain. *GTE N., Inc. v. Strand*, 209 F.3d 909, 921 (6th Cir. 2000).[4]

Moreover, *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976), also counsels abstention. This doctrine encourages "abstention in favor of ongoing, parallel state proceedings in cases where 'considerations of wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation' clearly favor abstention." *Ackerman v. ExxonMobil Corp.*, 734 F.3d 237, 248 (4th Cir. 2013) (quoting *Colo. River*, 424 U.S. at 817). Here, the parallelism requirement is met because Plaintiff Stoddard is

---

[4] Another federal court facing similar claims related to this election concluded that abstention was proper, rejecting the plaintiffs' request "to find that state officials have wrongly interpreted state law" where "an alternative appropriately exists with the . . . state courts." *Donald J. Trump for President, Inc. v. Boockvar*, No. 2:20-cv-966, 2020 WL 4920952, at *17 (W.D. Pa. Aug. 23, 2020) (quoting *Fuente v. Cortes*, 207 F. Supp. 3d 441, 452 (M.D. Pa. 2016)).

currently involved in a state court action that implicates the same issues of Michigan law. *See* Exs. 7–9.[5] The other relevant factors—including avoiding piecemeal litigation, the order and relative progress of the cases, the critical issues of state law at stake, and the adequacy of the state court to continue addressing these issues—also weigh heavily in favor of abstention. *See Preferred Care of Del., Inc. v. VanArsdale*, 676 F. App'x 388, 395 (6th Cir. 2017).

Finally, Plaintiffs' claims are precluded under *Burford* abstention, which is appropriate, as here,

> where timely and adequate state-court review is available and (1) a case presents "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the case at bar," or (2) the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."

*Caudill v. Eubanks Farms, Inc.*, 301 F.3d 658, 660 (6th Cir. 2002) (quoting *New Orleans Pub. Serv., Inc. v. Council*, 491 U.S. 350, 361 (1989)); *see also Burford v. Sun Oil Co.*, 319 U.S. 315, 334 (1943). There can be no dispute that presidential elections implicate a vital area of state policy. The U.S. Constitution delegates *to the states* the responsibility for determining the "Manner" in which it appoints presidential electors. U.S. Const. art. I, § 4, cl. 1. Michigan therefore has a compelling interest in the orderly administration and certification of its election. Indeed, as Plaintiffs' complaint notes, Michigan has an extensive Election Code that provides for an orderly certification of election results. Accordingly, because the State has "primary authority over the

---

[5] Parallelism in this case is not defeated simply because the state court litigation does not raise identical claims; it is sufficient that the claims are "predicated on the same allegations as to the same material facts." *Romine v. Compuserve Corp.*, 160 F.3d 337, 340 (6th Cir. 1998). Nor does it matter that this case was filed by additional Plaintiffs; the Sixth Circuit has "never held that identity of parties is required for parallelism. In fact, [it has] held the opposite." *Healthcare Co. v. Upward Mobility, Inc.*, 784 F. App'x 390, 395 (6th Cir. 2019); *cf. Lumen Constr., Inc. v. Brant Constr. Co.*, 780 F.2d 691, 695 (7th Cir. 1985) (*Colorado River* doctrine cannot be evaded by naming additional parties).

administration of elections," *Hunter*, 635 F.3d at 232, abstention is proper—this case implicates an area where "the State's interests are paramount" and thus "would best be adjudicated in a state forum." *Caudill*, 301 F.3d at 660 (quoting *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 728 (1996)).

Plaintiffs should not be permitted to employ the federal courts in a transparent effort to relitigate the *same* claims that continue to fail in state court. This blatant "attempt to . . . avoid adverse rulings by the state court . . . weighs strongly in favor of abstention." *Nakash v. Marciano*, 882 F.2d 1411, 1417 (9th Cir. 1989).

**B.     The Eleventh Amendment bars Plaintiffs' claims.**

The Eleventh Amendment bars this Court from issuing Plaintiffs' requested relief because a federal court cannot order state officials to conform to state law.

As the U.S. Supreme Court explained decades ago in *Pennhurst State School & Hospital v. Halderman*, "the principles of federalism that underlie the Eleventh Amendment" prohibit a federal court from granting "relief against state officials on the basis of state law, whether prospective or retroactive." 465 U.S. 89, 106 (1984); *see also In re Ohio Execution Protocol Litig.*, 709 F. App'x 779, 787 (6th Cir. 2017) ("If the plaintiff sues a state official under state law in federal court for actions taken within the scope of his authority, sovereign immunity bars the lawsuit regardless of whether the action seeks monetary or injunctive relief."). This is true even where state law claims are styled as federal causes of action. *See, e.g.*, *Balsam v. Sec'y of State*, 607 F. App'x 177, 183–84 (3d Cir. 2015) (holding that Eleventh Amendment bars state law claims even when "premised on violations of the federal Constitution"); *Massey v. Coon*, No. 87-3768, 1989 WL 884, at *2 (9th Cir. Jan. 3, 1989) (affirming dismissal of suit where "on its face the complaint states a claim under the due process and equal protection clauses of the Constitution,

[but] these constitutional claims are entirely based on the failure of defendants to conform to state law"); *Six v. Newsom*, 462 F. Supp. 3d 1060, 1073 (C.D. Cal. 2020) (denying temporary restraining order in part because Fifth and Fourteenth Amendment claims were predicated on violations of state law); *Acosta v. Democratic City Comm.*, 288 F. Supp. 3d 597, 626 (E.D. Pa. 2018) ("Even when voters attempt to 'tie their state law claims into their federal claims,' the Eleventh Amendment bars the state law claims." (quoting *Balsam*, 607 F. App'x at 183)).[6]

Although ostensibly cloaked as federal causes of action, each of Plaintiffs' claims ultimately—and exclusively—asks the Court to compel election authorities to do what Plaintiffs believe *Michigan* law requires. Counts I and II, Plaintiffs' due process and equal protection claims, both hinge on the alleged casting and counting of fraudulent ballots. *See, e.g.*, Compl. ¶¶ 111, 116, 121. But whether fraudulent ballots were tallied, and whether Defendants abided by their statutory responsibilities, are question of *state law*, not federal law; Michigan's Election Code provides the standards for whether ballots are lawfully voted and counted in Michigan, not any federal statute. Accordingly, this Court cannot "enjoin Defendants from finally certifying the election results and declaring winners of the 2020 general election until an independent audit . . . is performed," *id.* at 25, based on votes cast in alleged violation of state law without running afoul of the Eleventh Amendment. Indeed, these claims' lack of federal character is further revealed by the fact that Plaintiffs' theories of vote dilution and fundamental unfairness cannot give rise to federal causes of action under the Equal Protection and Due Process Clauses. *See, e.g.*, *Donald J. Trump for*

---

[6] The Third Circuit's decision in *Pennsylvania Federation of Sportsmen's Clubs, Inc. v. Hess*, 297 F.3d 310 (3d Cir. 2002), is instructive. There, the plaintiffs sued a state agency for declaratory and injunctive relief under the federal Surface Mining Control and Reclamation Act of 1977 ("SMCRA"). Even though the plaintiffs' allegations nominally alleged violations of the SMCRA, the court found that once the state's regulatory system was approved, "jurisdiction for its administration and enforcement devolved on the state," and accordingly, "prospective relief vis-à-vis that program . . . is barred in federal court by the Eleventh Amendment." *Id.* at 325.

*President, Inc. v. Boockvar*, No. 2:20-cv-966, 2020 WL 5997680, at *43 (W.D. Pa. Oct. 10, 2020) (vote dilution "is not an equal-protection issue"); *see also infra* Part IV.E.2–3. Because Plaintiffs have not advanced legitimate federal vote-dilution or due process claims, and the actual substance of these claims is predicated on violations of state law, they are barred under *Pennhurst*.

Count III, Plaintiffs' claim under the Electors Clause, is precluded for the same reason. Plaintiffs' sole allegation is that the Secretary "created, adopted, and enforced" an "absentee ballot scheme . . . *without legislative authorization*." Compl. ¶ 124 (emphasis added). Though superficially an Electors Clause claim, the only legal issue raised by Count III is whether the actions undertaken by the Secretary—a *state official*—conflicted with *state law* enacted by the Michigan Legislature. Thus, the Eleventh Amendment also bars Count III.

The distinction between an *actual* federal claim under the Electors Clause and a state law claim masquerading as a federal claim (like Count III) becomes apparent when looking at other cases brought under the Electors and Elections Clauses.[7] In *Cook v. Gralike*, for example, the U.S. Supreme Court struck down a Missouri law that mandated a ballot designation for any congressional candidate who refused to commit to term limits after concluding that such a rule constituted a "'regulation' of congressional elections" under the Elections Clause. 531 U.S. 510, 525–26 (2001) (quoting U.S. Const. art. I, § 4, cl. 1). And in *Arizona State Legislature v. Arizona Independent Redistricting Commission*, the Supreme Court upheld a law that delegated the redistricting process to an independent commission after reaffirming that "the Legislature" as used

---

[7] The Elections and Electors Clauses play functionally identical roles, with the former setting the terms for congressional elections and the latter implicating presidential elections. *See Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 839 (2015) (Roberts, C.J., dissenting) (noting that Electors Clause is "a constitutional provision with considerable similarity to the Elections Clause"); *Foster v. Love*, 522 U.S. 67, 69 (1997) (referring to Electors Clause as Elections Clause's "counterpart for the Executive Branch"); *Millsaps v. Thompson*, 259 F.3d 535, 538 (6th Cir. 2001) (same). Cases interpreting one therefore inform claims implicating the other.

in the Elections Clause includes "the State's lawmaking processes." 576 U.S. 787, 824 (2015). In these cases, the task of federal courts was to measure state laws against *federal* mandates set out under the Elections Clause—in the former, what is a "regulation"; in the latter, who is "the Legislature." No such federal question is posed here. Instead, the only issue presented in Plaintiffs' complaint is whether the Secretary followed the Election Code's absentee ballot provisions. No amount of hand-waving or ex post rationalization can change the fact that Count III, like Plaintiffs' other claims, is premised solely on violations of state law. All of their claims are therefore barred by the Eleventh Amendment.[8]

## C.   Plaintiffs lack standing.

Even if this Court does not abstain, this action should be dismissed because Plaintiffs lack both Article III and prudential standing to bring their claims.

The standing "inquiry involves 'both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.'" *Kowalski v. Tesmer*, 543 U.S. 125, 128 (2004) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). To avoid dismissal on Article III grounds, a plaintiff must show (1) an injury in fact, meaning "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (2) a causal connection between the injury and the defendant's conduct, and (3) a likelihood that the

---

[8] Notably, federal courts regularly reject state law claims against state officials in litigation involving election administration. *See, e.g.*, *Ohio Republican Party v. Brunner*, 543 F.3d 357, 360–61 (6th Cir. 2008) (*Pennhurst* bars claim that Secretary of State violated state election law); *Acosta*, 288 F. Supp. 3d at 628 (Eleventh Amendment bars Pennsylvania Election Code claims); *Veasey v. Perry*, 29 F. Supp. 3d 896, 922 (S.D. Tex. 2014) (Eleventh Amendment bars claim that state officials violated state constitution); *Common Cause/Ga. v. Billups*, 406 F. Supp. 2d 1326, 1358–59 (N.D. Ga. 2005) (same). This is unsurprising; federal and presidential elections in particular are *entirely* administered by the states, under rules proscribed by state law. *See Chiafalo v. Washington*, 140 S. Ct. 2316, 2324 (2020) (U.S. Constitution "gives the States far-reaching authority over presidential electors, absent some other constitutional constraint").

injury will be redressed by a favorable decision from the court. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547–48 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). Additionally, prudential considerations require that "a plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Int'l Union v. Dana Corp.*, 278 F.3d 548, 559 (6th Cir. 2002) (quoting *Warth*, 422 U.S. at 499).

### 1.    Plaintiffs do not allege harms sufficient to satisfy Article III standing.

Plaintiffs lack Article III standing because they fail to allege any "concrete and particularized" injuries-in-fact. *Lujan*, 504 U.S. at 560–61. Plaintiffs do not allege that they were deprived of the right to vote, nor that they or *any* voter submitted an absentee ballot that was improperly rejected. *See Bognet v. Sec'y of Commonwealth*, No. 20-3214, 2020 WL 6686120, at *11 (3d Cir. Nov. 13, 2020). Instead, they assert only generalized grievances that do not satisfy Article III.

*First*, all three of Plaintiffs' claims are premised on the alleged injury of vote dilution—that "[i]nvalid or fraudulent votes debase and dilute the weight of each validly cast vote." Compl. ¶ 109; *see also id.* ¶ 121. But this purported injury of vote-dilution-through-unlawful balloting has been repeatedly rejected by federal courts as a viable basis for standing, and for good reason: any purported vote dilution somehow caused by counting allegedly improper votes would affect *all* Michigan voters, not just Plaintiffs, and therefore constitutes a generalized grievance that cannot support standing. *See, e.g.*, *Bognet*, 2020 WL 6686120, at *12–14 (rejecting similar vote-dilution injury as "paradigmatic generalized grievance that cannot support standing" (quoting *Bognet v. Boockvar*, No. 3:20-cv-215, 2020 WL 6323121, at *4 (W.D. Pa. Oct. 28, 2020))); *Donald J. Trump for President, Inc. v. Cegavske*, No. 2:20-CV-1445 JCM (VCF), 2020 WL 5626974, at *4 (D. Nev.

Sept. 18, 2020); *Martel v. Condos*, No. 5:20-cv-131, 2020 WL 5755289, at *4 (D. Vt. Sept. 16, 2020); *Paher v. Cegavske*, 457 F. Supp. 3d 919, 926–27 (D. Nev. 2020); *Am. Civil Rights Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 789 (W.D. Tex. 2015). Plaintiffs also suggest that they were injured by the allegedly "patent and fundamental unfairness" of the election, Compl. ¶ 114—a purported harm that is no less generalized, and no more particularized and concrete, than their vote-dilution injury.

*Second*, Plaintiffs claim they have suffered harm as a result of the alleged violation of the Electors Clause. *See id.* ¶ 125. That "injury is precisely the kind of undifferentiated, generalized grievance about the conduct of government" that does not support standing. *Lance v. Coffman*, 549 U.S. 437, 442 (2007) (per curiam) (plaintiffs lacked standing to bring Elections Clause claim). And "[i]t is quite different from the sorts of injuries alleged by plaintiffs in voting rights cases where" the Supreme Court has found standing. *Id.* (citing *Baker v. Carr*, 369 U.S. 186, 207–08 (1962)); *see also Bognet*, 2020 WL 6686120, at *13.

In short, Plaintiffs assert only generalized, unparticularized injuries and thus lack standing to bring their claims.

### 2. Plaintiffs' lack prudential standing to bring Count III.

Plaintiffs also lack prudential standing to bring their Electors Clause claim. "Even if an injury in fact is demonstrated, the usual rule"—applicable here—"is that a party may assert only a violation of its own rights." *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392 (1988). Plaintiffs' Count III, by contrast, "rest[s] . . . on the legal rights or interests of third parties,'" *Kowalski*, 543 U.S. at 129 (quoting *Warth*, 422 U.S. at 499)—specifically, *the Michigan Legislature's* purported rights under the Electors Clause.

Plaintiffs assert that the Secretary violated the Electors Clause when she distributed

16

absentee ballot applications "without legislative authorization." Compl. ¶ 124; *see also id.* ¶ 4 (alleging that Secretary's "actions were not approved or authorized by the State legislature"). Plaintiffs, however, have no authority or standing to assert the rights of the Michigan Legislature. *See Corman v. Torres*, 287 F. Supp. 3d 558, 573 (M.D. Pa. 2018) (per curiam) ("[T]he Elections Clause claims asserted in the verified complaint belong, if they belong to anyone, only to the Pennsylvania General Assembly."); *Bognet*, 2020 WL 6686120, at *7 (similar); *cf. Lance*, 549 U.S. at 442 (observing that U.S. Supreme Court's "decisions construing the term 'Legislature' in the Elections Clause [were] filed by a relator on behalf of the State rather than private citizens acting on their own behalf").[9] Plaintiffs are not the Michigan Legislature, and they have identified no "'hindrance' to the [Legislature's] ability to protect [its] own interests." *Kowalski*, 543 U.S. at 130 (quoting *Powers v. Ohio*, 499 U.S. 400, 411 (1991)). "Absent a 'hindrance' to the third-party's ability to defend its own rights, this prudential limitation on standing cannot be excused." *Corman*, 287 F. Supp. 3d at 572 (quoting *Kowalski*, 543 U.S. at 130). Count III should therefore be dismissed.[10]

**D.      Plaintiffs' claims are barred by the equitable doctrine of laches.**

Plaintiffs' challenges to both the Secretary's "absentee ballot scheme," Compl. ¶ 89, and the purported "issues of fraud and other illegal conduct," *id.* ¶ 21, come too late and are barred by the doctrine of laches. "In this circuit, laches is 'a negligent and unintentional failure to protect

---

[9] Although *Corman* and *Lance* specifically concerned the Elections Clause only, the Elections and Electors Clauses are analogous. *See supra* note 7; *see also Bognet*, 2020 WL 6686120, at *7 (applying same standing analysis to Elections Clause and Electors Clause claims).

[10] The Third Circuit's recent opinion in *Bognet* is instructive. There, the plaintiffs—"four individual voters and a candidate for federal office"—brought similar challenges to Pennsylvania's election rules that the court denied because "they lack standing to sue over the alleged usurpation of the General Assembly's rights under the Elections and Electors Clauses." *Bognet*, 2020 WL 6686120, at *7.

one's rights.'" *United States v. City of Loveland*, 621 F.3d 465, 473 (6th Cir. 2010) (quoting *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 894 (6th Cir. 1991)). "A party asserting laches must show: (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting it." *Id.* at 473 (quoting *Herman Miller, Inc. v. Palazzetti Imps. & Exps., Inc.*, 270 F.3d 298, 320 (6th Cir. 2001)). Both requirements are easily met here.

The Secretary announced on May 19—six months ago—"that all registered voters in Michigan will receive an application to vote by mail in the August and November elections." *Benson: All Voters Receiving Applications to Vote by Mail*, Mich. Sec'y of State (May 19, 2020), https://www.michigan.gov/sos/0,4670,7-127-1640_9150-529536--,00.html.[11] Her office launched its "online absentee voter application" on June 12. *Michigan Department of State Launches Online Absentee Voter Application*, Mich. Sec'y of State (June 12, 2020), https://www.michigan.gov/sos/0,4670,7-127-1640_9150-531796--,00.html. Plaintiffs should have been aware of these plans well before election day—they certainly give no indication they were unaware—and they could and should have brought their related claims much earlier. Indeed, other plaintiffs challenged the Secretary's mailing of absentee ballot applications as early as *May 20. See* Pls.' Compl., *Cooper-Keel v. Mich. Sec'y of State*, No. 20-000091-MM (Mich. Ct. Cl. May 20, 2020) (attached as Ex. 19). Furthermore, the alleged "fraud and other illegal conduct occurring at the TCF Center and elsewhere" that forms the other basis for Plaintiffs' complaint happened on November 3 and 4, *see* Compl. ¶¶ 21–87, and yet Plaintiffs waited until November 15—*twelve days* after election day—

---

[11] The Court may take judicial notice of "'government documents available from reliable sources on the Internet,' such as websites run by governmental agencies." *United States ex rel. Modglin v. DJO Glob. Inc.*, 48 F. Supp. 3d 1362, 1381 (C.D. Cal. 2014) (quoting *Hansen Beverage Co. v. Innovation Ventures, LLC*, No. 08-CV-1166-IEG (POR), 2009 WL 6597891, at *2 (S.D. Cal. Dec. 23, 2009)); *see also supra* note 1.

to bring this case. Again, suits with near-identical allegations were brought as early as election day itself, including one brought on November 4 by Plaintiff Stoddard. *See* Exs. 7–9.

Plaintiffs' delay was consequential. Now that the ballots have been opened, separated from their envelopes, and counted, any late-hour relief would be administratively infeasible, and if Plaintiffs' challenges were sustained, the votes of hundreds of thousands—perhaps millions—of Michiganders would be at risk through no fault of their own. That severe prejudice to both Defendants and voters would be contrary to fundamental principles of equity. *Cf. Kay v. Austin*, 621 F.2d 809, 813 (6th Cir. 1980) ("As time passes, the state's interest in proceeding with the election increases in importance as resources are committed and irrevocable decisions are made."); *Crookston v. Johnson*, 841 F.3d 396, 398–99 (6th Cir. 2016) (noting that late-hour change to election procedures "would require nuanced policy decisions that no one should be making at the eleventh hour—absent a good explanation for the delay" and that "[w]hen an election is 'imminen[t]' and when there is 'inadequate time to resolve [] factual disputes' and legal disputes, courts will generally decline to grant an injunction to alter a State's established election procedures" (second and third alterations in original) (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 5–6 (2006))).

Plaintiffs should not be permitted to lie in wait to gauge election results and file suit only after their preferred candidate does not prevail. "[T]he failure to require prompt pre-election action . . . as a prerequisite to post-election relief may permit, if not encourage, parties who could raise a claim 'to lay by and gamble upon receiving a favorable decision of the electorate' and then, upon losing, seek to undo the ballot results in a court action." *Toney v. White*, 488 F.2d 310, 314 (5th Cir. 1973) (en banc) (quoting *Toney v. White*, 476 F.2d 203, 209 (5th Cir. 1973)). Accordingly, "[c]ourts will consider granting post-election relief only where the plaintiffs were not aware of a

major problem prior to the election or where by the nature of the case they had no opportunity to seek pre-election relief," *Hart v. King*, 470 F. Supp. 1195, 1198 (D. Haw. 1979), even where parties allege far more egregious misconduct than Plaintiffs' vague allegations here. *See, e.g.*, *Tucker v. Burford*, 603 F. Supp. 276, 279 (N.D. Miss. 1985) (refusing to void election even where defendants conceded that districts were malapportioned because "to grant the extraordinary relief of setting aside an election . . . . would be to embrace the hedging posture" that courts have discouraged). This Court should therefore dismiss Plaintiffs' belated claims.

**E.      Plaintiffs fail to state a claim on which relief can be granted.**

**1.      Plaintiffs' claims are not plausible.**

Parties who seek relief from a federal court must allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. While "the pleading standard that Rule 8 announces does not require 'detailed factual allegations,' [] it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). And although Rule 12(b)(6) requires that allegations be viewed in the light most favorable to the nonmovant, the nonmoving party must still meet the Rule 8 plausibility mandate.

Plaintiffs fail to satisfy this basic requirement. At heart, their complaint suggests a massive, coordinated effort among election officials and volunteers to perpetrate electoral fraud and swing a presidential election. *See* Compl. ¶¶ 21–87. And yet despite the presence of challengers like Plaintiffs—the existence of whom is referenced throughout the complaint—all Plaintiffs can produce to support their narrative of widespread malefaction are isolated allegations of perceived misconduct and allegedly suspicious activities, couched in vague terms without any specific

details, such as how many allegedly invalid ballots were counted, how many ballots were allegedly altered, and how many ballots were supposedly duplicated incorrectly.[12]

The U.S. Supreme Court has instructed that "[d]etermining whether a complaint states a plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. 662, 679 (2009). It challenges both experience and common sense to accept Plaintiffs' overarching theory that widespread fraud occurred during the most scrutinized and observed election in modern history.[13] Under applicable pleading standards, this Court need not credit Plaintiffs' unwarranted factual inferences. Absent basic plausibility, Plaintiffs' complaint should be dismissed.

## 2.    Plaintiffs have not pleaded a viable due process claim.

With Count I, Plaintiffs attempt to raise their allegations regarding fraudulent voting to the level of a due process violation, based on two apparent theories: that the casting of unlawful ballots diluted the value of Plaintiffs' votes, *see* Compl. ¶¶ 106–11, and that the election in Michigan

---

[12] Where, as here, the Complaint expressly alleges "fraud," Rule 9(b) requires pleading with "particularity." Notably, this pleading standard requires "[a]t a minimum" that allegations of fraud "specify the 'who, what, when, where, and how' of the alleged fraud." *Sanderson v. HCA-Healthcare Co.*, 447 F.3d 873, 877 (6th Cir. 2006) (quoting *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir.1997)); *see also id.* (concluding that plaintiffs failed to satisfy pleading standard where they included nothing "to alert the defendants 'to the precise misconduct with which they are charged and [to] protect[] defendants against spurious charges of immoral and fraudulent behavior'" (alterations in original) (quoting *United States ex rel. Clausen v. Lab'y Corp. of Am.*, 290 F.3d 1301, 1310 (11th Cir. 2002))); *Constantino*, slip op. at 2 (noting that "[i]n cases of alleged fraud, the Plaintiff must state with particularity the circumstances constituting the fraud" and denying challenge to Wayne County's returns where, as here, plaintiffs provided affidavits containing vague and unspecific allegations of misconduct) (attached as Ex. 16).

[13] *See Joint Statement from Elections Infrastructure Government Coordinating Council & the Election Infrastructure Sector Coordinating Executive Committees*, Cybersecurity & Infrastructure Sec. Agency (Nov. 12, 2020), https://www.cisa.gov/news/2020/11/12/joint-statement-elections-infrastructure-government-coordinating-council-election ("The November 3rd election was the most secure in American history."); *see also supra* notes 1 & 11 (courts may take judicial notice of government websites).

"reache[d a] point of patent and fundamental unfairness" that constituted a due process violation, *id.* ¶¶ 112–14. Ultimately, even if Plaintiffs' factual allegations were plausible, neither theory lends itself to a cognizable due process claim, and Count I should be dismissed.

As discussed below, vote dilution is a context-specific theory of constitutional harm premised on the Equal Protection Clause that applies only where plaintiffs allege their votes were devalued compared to similarly situated voters in other parts of the state. Plaintiffs do not explain how the alleged dilution of their votes constitutes a due process violation, and at any rate, they have failed to plead a cognizable vote-dilution claim. *See infra* Part IV.E.3. Accordingly, vote dilution is not a sound basis for Count I.

Plaintiffs' attempt to transform alleged violations of Michigan's Election Code into a "fundamental fairness" federal due process violation fares no better. Throughout their complaint, Plaintiffs allege various irregularities and suspicious activities in the tabulation of Wayne County's ballots. But "[t]he Constitution is not an election fraud statute," *Minn. Voters All. v. Ritchie*, 720 F.3d 1029, 1031 (8th Cir. 2013) (quoting *Bodine v. Elkhart Cnty. Election Bd.*, 788 F.2d 1270, 1271 (7th Cir. 1986)), and it "d[oes] not authorize federal courts to be state election monitors." *Gamza v. Aguirre*, 619 F.2d 449, 454 (5th Cir. 1980); *see also Pettengill v. Putnam Cnty. R-1 Sch. Dist.*, 472 F.2d 121, 122 (8th Cir. 1983) (per curiam) (finding no cases "which authorize a federal court to be the arbiter of disputes over whether particular persons were or were not entitled to vote or over alleged irregularities in the transmission and handling of absentee voter ballots"). Nor are voters constitutionally entitled to an election free from error. "[G]arden variety election irregularities do not violate the Due Process Clause, *even if they control the outcome of the vote or election*." *Bennett v. Yoshina*, 140 F.3d 1218, 1226 (9th Cir. 1998) (emphasis added) (collecting cases). Even "a deliberate violation of state election laws by state election officials does not

transgress against the Constitution." *Shipley v. Chi. Bd. of Election Comm'rs*, 947 F.3d 1056, 1062 (7th Cir. 2020) (quoting *Kasper v. Bd. of Election Comm'rs*, 814 F.2d 332, 342 (7th Cir. 1987)).

Instead, it is only where "a pervasive error [] undermines the integrity of the vote" that the Constitution is implicated. *Bennett*, 140 F.3d at 1227. As the Ninth Circuit explained after considering the cases where election irregularities rose to the level of constitutional violations,

> [a] general pattern emerges from all of these cases taken together. Mere fraud or mistake will not render an election invalid. However, a court will strike down an election on substantive due process grounds if two elements are present: (1) likely reliance by voters on an established election procedure and/or official pronouncements about what the procedure will be in the coming election; and (2) significant disenfranchisement that results from a change in the election procedures.

*Id.* at 1226–27; *see also id.* at 1227 n.3 (noting that wholesale disenfranchisement of "entire electorate [] when legally required election did not occur" and "outrageous racial discrimination" might rise to level of "fundamental[] unfair[ness]" (quoting *Griffin v. Burns*, 570 F.2d 1065, 1080 (1st Cir. 1978))). In other words, the sort of unconstitutional irregularity that courts have entertained consists of widescale disenfranchisement.

Plaintiffs' allegations fall far short of such an extreme circumstance. At best, they allege isolated instances of misconduct at the Wayne County tabulation center and a purported "scheme" by the Secretary that *en*franchised voters by expanding access to absentee voting. Even taken together, their allegations fall far short of the sort of systemic *dis*enfranchisement that might constitute a due process violation. Indeed, the Fifth Circuit *rejected* a due process claim based on a similar slew of alleged irregularities, including "complaints about missing signatures, ballots that should have been mailed rather than hand-delivered, and six fraudulent votes"—even though the contested ballots were enough to decide the election—explaining that such claims implicated only "'garden variety' election disputes" for which "states," not federal courts, "are primarily

23

responsible." *Welch v. McKenzie*, 765 F.2d 1311, 1317 (5th Cir. 1985).[14] "[T]he due process clause . . . offer[s] no guarantee against errors in the administration of an election." *Powell v. Power*, 436 F.2d 84, 88 (2d Cir. 1970). Plaintiffs have simply not alleged "significant disenfranchisement" of the sort that could justify a due process claim based on the fundamental fairness of the election. *Bennett*, 140 F.3d at 1227. To the contrary, it is *Plaintiffs* who seek to negate the votes cast by hundreds of thousands, if not millions, of eligible Michigan voters; now that ballots have been tabulated and comingled, it would be seemingly impossible to identify and segregate challenged ballots, and under Plaintiffs' theory, *all* would therefore be at risk of rejection.

Finally, Plaintiffs' due process claim is precluded because there are adequate state law remedies to address their claims of voter fraud. "Where, as here, a plaintiff is aware of, yet fails to fully use, an adequate state administrative or judicial process to address a local election dispute, a claim that the election process created fundamental unfairness to warrant federal intervention cannot survive." *González-Cancel*, 696 F.3d at 120 (citing *Rosselló-González v. Calderón-Serra*, 398 F.3d 1, 16 (1st Cir. 2004)); *accord Griffin*, 570 F.2d at 1077 (noting that "even claims of official misconduct[] do not usually rise to the level of constitutional violations where adequate state corrective procedures exist"). Here, Plaintiffs are certainly aware of state judicial processes— Plaintiff Stoddard filed such a claim in Michigan state court. And state law further provides non-judicial remedies to address election issues. *See Costantino*, slip op. at 10–12 (describing remedies

---

[14] The Fifth Circuit and other courts thus have rejected constitutionalizing every election dispute. *See, e.g.*, *Gamza*, 619 F.3d at 453 ("If every state election irregularity were considered a federal constitutional deprivation, federal courts would adjudicate every state election dispute, and the elaborate state election contest procedures, designed to assure speedy and orderly disposition of the multitudinous questions that may arise in the electoral process, would be superseded by a [constitutional] gloss."); *Powell v. Power*, 436 F.2d 84, 86 (2d Cir. 1970) (rejecting theory that would "thrust" federal courts "into the details of virtually every election, tinkering with the state's election machinery" and "reviewing . . . for all manner of error and insufficiency under state and federal law").

under Michigan law for election challenges) (attached as Ex. 16). Given that, for example, Plaintiffs failed to petition the Wayne County Board of Canvassers, *see* Mich. Comp. Laws § 168.821, or seek an audit or recount, *see id.* §§ 168.31a, 168.871, Plaintiffs cannot now rely on a federal due process claim, and Count I should be dismissed.

### 3. Plaintiffs have not pleaded a viable equal protection claim.

Count II similarly fails to allege a cognizable equal protection claim. Plaintiffs' attempt to assert a under the theory of vote dilution fails as a matter of law.

Vote dilution is a viable basis for federal claims only in certain contexts, such as when laws structurally devalue one community's votes over another's. *See, e.g.*, *Bognet*, 2020 WL 6686120, at *11 ("[V]ote dilution under the Equal Protection Clause is concerned with votes being weighed differently."); *see also Reynolds v. Sims*, 377 U.S. 533, 568 (1964) ("Simply stated, an individual's right to vote for state legislators is unconstitutionally impaired when its weight is in a substantial fashion diluted when compared with votes of citizens living in other parts of the State."). In these cases, which are grounded in the Equal Protection Clause, plaintiffs allege that their votes are systematically devalued as compared to similarly situated voters in other parts of the state. *See Reynolds*, 377 U.S. at 567–68.

Here, by contrast, Plaintiffs' vote-dilution claim is premised on the theory that the casting of unlawful ballots has "caused the debasement and dilution of the weight of Plaintiffs' votes." Compl. ¶ 121. But "[t]his conceptualization of vote dilution—state actors counting ballots in violation of state election law—is not a concrete harm under the Equal Protection Clause of the Fourteenth Amendment." *Bognet*, 2020 WL 6686120, at *11. Indeed, Plaintiffs cannot identify a

single precedent adopting their theory.[15] This is unsurprising: the claim of vote dilution based on fears of potential fraud is speculative and applies to all voters equally, making it an ill-fit for an equal protection challenge. *Cf. Mays v. LaRose*, 951 F.3d 775, 785 (6th Cir. 2020) ("All binding authority to consider the burdensome effects of disparate treatment on the right to vote has done so from the perspective of only affected electors—not the perspective of the electorate as a whole.").

As discussed in Part IV.E.2 *supra*, "[t]he Constitution is not an election fraud statute." *Minn. Voters All.*, 720 F.3d at 1031 (quoting *Bodine*, 788 F.2d at 1271). There is no authority for transmogrifying the vote dilution line of cases into a requirement that the federal judiciary micromanage election procedures and, in its zeal to enforce state election statutes, disenfranchise lawful voters based on a plaintiff's (speculative) voter fraud allegations. "That is not how the Equal Protection Clause works." *Bognet*, 2020 WL 6686120, at *11; *cf. Short v. Brown*, 893 F.3d 671, 677–78 (9th Cir. 2018) ("Nor have the appellants cited any authority explaining how a law that makes it easier to vote would violate the Constitution.").[16] In fact, courts have routinely rejected

---

[15] *Bush v. Gore*, 531 U.S. 98 (2000) (per curiam), cited by Plaintiffs in their complaint, *see* Compl. ¶ 3, does not support their claim. In *Bush*, the U.S. Supreme Court considered "whether the use of standardless manual recounts" by some Florida counties in the aftermath of the 2000 presidential election violated the Equal Protection Clause. *Id.* at 103. In addition to being explicitly "limited to the present circumstances," the *Bush* Court addressed a situation where the counting of ballots lacked even "minimal procedural safeguards." *Id.* at 109. Here, by contrast, Michigan law provides those requisite safeguards—Plaintiffs themselves acknowledge this by citing to state law standards, *see* Compl. ¶ 86—and so *Bush* is inapposite. *Harper v. Virginia State Board of Elections*, 383 U.S. 663 (1966), also cited by Plaintiffs, *see* Compl. ¶ 104, was a case about poll taxes that has nothing to do with Plaintiffs' theory of vote dilution. And, as discussed above, *Reynolds*, *see id.* ¶¶ 104–05, 111, concerned vote dilution in the context of malapportionment, *not* allegedly unlawful voting.

[16] Indeed, "if dilution of lawfully cast ballots by the 'unlawful' counting of invalidly cast ballots 'were a true equal-protection problem, then it would transform every violation of state election law (and, actually, every violation of every law) into a potential federal equal-protection claim

such efforts. *See Minn. Voters All.*, 720 F.3d at 1031–32 (affirming Rule 12(b)(6) dismissal of vote-dilution claim); *see also Partido Nuevo Progresista v. Perez*, 639 F.2d 825, 827–28 (1st Cir. 1980) (per curiam) (rejecting challenge to purportedly invalid ballots because "case does not involve a state court order that *dis*enfranchises voters; rather it involves a [] decision that *en*franchises them—plaintiffs claim that votes were 'diluted' by the votes of others, not that they themselves were prevented from voting"); *Boockvar*, 2020 WL 5997680, at *67–68 (rejecting Trump Campaign's equal protection challenge to poll-watcher restrictions grounded in vote-dilution theory because restrictions did not burden fundamental right or discriminate based on suspect classification); *Cortés*, 218 F. Supp. 3d at 406–07 (rejecting requested expansion of poll-watcher eligibility based on premise that voter fraud would dilute plaintiffs' votes).

Because Plaintiffs have not pleaded a cognizable vote-dilution claim, Count II—and, to the extent it is premised on vote dilution, Count I—should be dismissed.

### 4. Plaintiffs have not pleaded a viable Electors Clause claim.

Finally, Count III—Plaintiffs' claim under the Electors Clause, *see* Compl. ¶¶ 123–25—fails as a matter of law because, as the Michigan Court of Appeals has already held, the Secretary acted consistently with the authority lawfully delegated to her by the Michigan Legislature.

The Electors Clause vests authority in "the Legislature" of each state to regulate presidential elections. U.S. Const. art. II, § 1, cl. 2. The U.S. Supreme Court has held, however, that state legislatures can delegate this authority. *See, e.g.*, *Ariz. State Legislature*, 576 U.S. at 807 (noting that Elections Clause does not preclude "the State's choice to include" state officials in lawmaking functions so long as such involvement is "in accordance with the method which the

---

requiring scrutiny of the government's "interest" in failing to do more to stop the illegal activity.'" *Bognet*, 2020 WL 6686120, at *11 (quoting *Boockvar*, 2020 WL 5997680, at *46).

State has prescribed for legislative enactments" (quoting *Smiley v. Holm*, 285 U.S. 355, 367 (1932))); *Corman*, 287 F. Supp. 3d at 573 ("The Supreme Court interprets the words 'the Legislature thereof,' as used in that clause, to mean the lawmaking processes of a state." (quoting *Ariz. State Legislature*, 576 U.S. at 816)); *see also supra* note 7.

Thus, the issue Plaintiffs ask this Court to adjudicate is simply one of state law: whether the Secretary exceeded the statutory authority delegated by the Legislature. That questions falls within the province of state courts, *see Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975) ("This Court . . . repeatedly has held that state courts are the ultimate expositors of state law."), and the Michigan Court of Appeals—considering the *very same* statutory arguments that Plaintiffs make here—has already held "that the authority and discretion afforded the Secretary of State by the constitution and state law permit defendant to send unsolicited absent voter ballot applications to all Michigan qualified registered voters." *Davis*, 2020 WL 5552822, at *7.[17]

The opinion of the Court of Appeals is controlling as a matter of law and, in any event, is correctly decided. *See West*, 311 U.S. at 237 ("Where an intermediate appellate state court rests its considered judgment upon the rule of law which it announces, that is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise."). The Secretary is "the chief election officer of the state and shall have supervisory control over local election officials in the performance of their duties under the provisions of this act." Mich. Comp. Laws § 168.21. As part of her statutorily delegated authority, the Secretary has the duty to "advise and direct local election

---

[17] This case is pending on application for leave to appeal to the Michigan Supreme Court. Nevertheless, even "a Supreme Court order *granting* leave to appeal does not diminish the precedential effect of a published opinion of the Court of Appeals." Mich. Ct. R. 7.215(C)(2) (emphasis added).

officials as to the proper methods of conducting elections." *Id.* § 168.31(1)(b). She "shall" also "[p]ublish and furnish" "specific instructions on assisting voters in casting their ballots." *Id.* § 168.31(1)(c). Moreover, the Secretary "shall," in her discretion, "[p]rescribe and require uniform forms, notices, and supplies the secretary of state considers advisable for use in the conduct of elections and registrations." *Id.* § 168.31(1)(e). Notably, Michigan Compiled Laws section 168.31 does not limit the duties of the Secretary to *only* delineated acts; instead, the Legislature has granted her discretionary authority to make decisions and determinations about which methods are proper, provided they are not contradicted or prohibited elsewhere in the state constitution or Michigan's Election Code. Contrary to Plaintiffs' assertion, Compl. ¶ 91, nothing in Michigan Compiled Laws section 168.759 prohibits the Secretary from providing voters with unsolicited absentee ballot applications. Nowhere does that provision reference the Secretary and, regardless, it states only that "[a]n application for an absent voter ballot under this section *may* be made in any of the following ways." Mich. Comp. Laws § 168.759(3) (emphasis added); *see also Davis*, 2020 WL 5552822, at *4–5.

The Michigan Court of Appeals' plain reading of Michigan law does not offend the Electors Clause, and Plaintiffs point to no authority that suggests otherwise. Plaintiffs claim that the Electors Clause requires state legislatures *alone* to prescribe the manner of elections. *See* Compl. ¶ 6 (citing *McPherson v. Blacker*, 146 U.S. 1, 35 (1892)). But even setting aside the 128 years of intervening Supreme Court cases limiting the plenary power of state legislatures, *McPherson* itself explained that legislatures may delegate their authority under the Electors Clause. *See* 146 U.S. at 25 (noting that state legislatures may exercise authority under Electors Clause by "joint ballot or concurrence of the two houses, or according to such mode as designated"). Although the power delegated to state legislatures by the Electors Clause "cannot be

taken from" them, a legislature may "authorize the governor, or the supreme court of the state, or any other agent of its will" to satisfy its duties under the Clause. *Id.* at 34–35. *Bush v. Palm Beach County Canvassing Board*, 531 U.S. 70 (2000) (per curiam), also cited by Plaintiffs, *see* Compl. ¶ 6, does not state anything to the contrary.

In short, a legislature itself can delegate authority related to the regulation of presidential elections—as the Michigan Legislature delegated to the Secretary—without offending the Electors Clause. Plaintiffs' allegations do not plausibly allege an Electors Clause violation, and Count III must be dismissed.

### F.   Plaintiffs are not entitled to the relief they seek.

Even if this Court had jurisdiction over this matter (it does not), and Plaintiffs had pleaded plausible and cognizable claims (they have not), Plaintiffs would not be entitled to the extraordinary relief they seek. Plaintiffs ask this Court to enjoin Defendants from certifying Michigan's results "until an independent audit to ensure the accuracy and integrity of the election is performed" or some other judicially imposed review is completed. Compl. 25. This extraordinary request is not a proper remedy in this case.

As an initial matter, Michigan law does not contemplate the judicially imposed audit that Plaintiffs seek. Instead, Michigan Compiled Laws section 168.31a sets forth a process by which the Secretary may conduct an audit *after* an election is certified and any recounts are concluded.

Moreover, it is only in the rarest of circumstances that federal courts have prevented certification of election results, and only where the evidence established that there was a fundamental failure of the electoral process. *See Stein v. Cortés*, 223 F. Supp. 3d 423, 438 (E.D. Pa. 2016) (collecting cases). Plaintiffs' allegations do not constitute the systemic fraud or widescale disenfranchisement that might justify such drastic relief. Accordingly, because Plaintiffs' gambit to circumvent the will of the Michigan electorate "has no essential or important

30

relationship to the claim for relief," their prayer for relief reflecting this inordinate request should be dismissed or, in the alternative, stricken under Rule 12(f) as immaterial. *Rees v. PNC Bank, N.A.*, 308 F.R.D. 266, 271 (N.D. Cal. 2015) (quoting *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993)); *see also, e.g.*, *Williamsburg Commons Condo. Ass'n v. State Farm Fire & Cas. Co.*, 907 F. Supp. 2d 673, 680 (E.D. Pa. 2012) (granting motion to dismiss requested relief).

Even if Plaintiffs' allegations were true (they are not) and there were isolated and sporadic incidents in which Michigan's election laws were violated—not by the *voters*, but by election workers—this could not possibly justify the disenfranchisement of Michiganders that might result from a prolonged delay in certification. *See Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 595, 597–98 (6th Cir. 2012) (concluding that rejection of ballots invalidly cast due to poll worker error likely violates due process); *United States v. Saylor*, 322 U.S. 385, 387–88 (1944) ("[T]o refuse to count and return the vote as cast [is] as much an infringement of that personal right as to exclude the voter from the polling place."); *cf. Bognet*, 2020 WL 6686120, at *1 (considering election challenge "with commitment to a proposition indisputable in our democratic process: that the lawfully cast vote of every citizen must count"). Discarding the ballots of lawful Michigan voters that were not cast or tabulated pursuant to Plaintiffs' preferred procedures "would be both outrageous and completely unnecessary." *Stein*, 223 F. Supp. 3d at 442; *see also Gallagher v. N.Y. State Bd. of Elections*, No. 20-5504 (AT), 2020 WL 4496849, at *16 (S.D.N.Y. Aug. 3, 2020) (rejecting "grossly overinclusive" election scheme that would "not meaningfully advance the state interest at issue"). And this remedy would violate Michiganders' fundamental voting rights, including the Michigan Constitution's self-executing right to vote absentee, *see* Mich. Const. art. II, § 4(1)(g), which voters passed in 2018 by an overwhelming popular vote and took advantage

of in unprecedented numbers during this past election. Plaintiffs' prayer for relief should therefore be stricken or, in the alternative, dismissed. *See Rees*, 308 F.R.D. at 271.

## V.    CONCLUSION

For the foregoing reasons, Proposed Intervenor-Defendants DNC Services Corporation/Democratic National Committee and Michigan Democratic Party respectfully request that the Court dismiss Plaintiffs' complaint.

Dated: November 18, 2020.    Respectfully submitted,

           /s/ *Scott R. Eldridge*
           Scott R. Eldridge (P66452)
           Joe M. Infante (P68719)
           MILLER CANFIELD
           One Michigan Avenue, Suite 900
           Lansing, Michigan 48933
           Telephone: (517) 483-4918
           eldridge@millercanfield.com
           infante@millercanfield.com

           Mary Ellen Gurewitz (P25724)
           CUMMINGS & CUMMINGS
           423 North Main Street, Suite 200
           Royal Oak, Michigan 48067
           Telephone: (248) 733-3405
           maryellen@cummingslawpllc.com

           Marc E. Elias (DC #442007)
           John M. Devaney (DC #375465)*
           Jyoti Jasrasaria (DC #1671527)
           PERKINS COIE LLP
           700 Thirteenth Street NW, Suite 800
           Washington, DC 20005
           Telephone: (202) 654-6200
           melias@perkinscoie.com
           jdevaney@perkinscoie.com
           jjasrasaria@perkinscoie.com

           William B. Stafford (WA #39849)*
           Jonathan P. Hawley (WA #56297)
           PERKINS COIE LLP
           1201 Third Avenue, Suite 4900
           Seattle, Washington 98101
           Telephone: (206) 359-8000
           wstafford@perkinscoie.com
           jhawley@perkinscoie.com

Seth P. Waxman (DC #257337)
Brian M. Boynton (DC #483187)
WILMER CUTLER PICKERING HALE AND
DORR LLP
1875 Pennsylvania Avenue NW
Washington, D.C. 20006
Telephone: (202) 663-6000
seth.waxman@wilmerhale.com
brian.boynton@wilmerhale.com

John F. Walsh (CO #16642)
WILMER CUTLER PICKERING HALE AND
DORR LLP
1225 Seventeenth Street, Suite 2600
Denver, Colorado 80202
Telephone: (720) 274-3154
john.walsh@wilmerhale.com

*Counsel for Proposed Intervenor-Defendants
DNC Services Corporation/Democratic National
Committee and Michigan Democratic Party*

*Admission pending