# EXHIBIT 4

STATE OF MICHIGAN
IN THE THIRD CIRCUIT COURT FOR THE COUNTY OF WAYNE

CHERYL A. COSTANTINO and EDWARD P. MCCALL, JR.,

      Plaintiffs,

v.

Case No. 20-014780-AW

CITY OF DETROIT; DETROIT ELECTION COMMISSION; JANICE M. WINFREY, in her official capacity as the CLERK OF THE CITY OF DETROIT and the Chairperson of the DETROIT ELECTION COMMISSION; CATHY M. GARRETT, in her official capacity as the CLERK OF WAYNE COUNTY; and the WAYNE COUNTY BOARD OF CANVASSERS,

      Defendants,

v.

MICHIGAN DEMOCRATIC PARTY,

      [Proposed] Intervenor Defendant.
_____/

**AFFIDAVIT OF DAVID JAFFE**

I, David Jaffe, having been duly sworn according to law, do hereby depose and state as follows.

1. I am at least 18 years of age and have personal knowledge of the below facts, which are true and accurate to the best of my knowledge and belief.

2. I am a United States citizen and a resident of and registered voter in Michigan, and I am an attorney licensed to practice in Michigan. I served as a law clerk to Chief Judge James Browning of the U.S. Court of Appeals for the Ninth Circuit, and to (then) Justice William Rehnquist of the Supreme Court of the United States. I currently have my own solo law practice,

and have in the past been a partner at Honigman Miller Schwartz and Cohn and the Vice President, General Counsel and Secretary of Guardian Industries Corp. (among other positions).

3. On November 2, 3, and 4, 2020, I served as a credentialed challenger for the Michigan Democratic Party at the Detroit Absent Voter Counting Board (AVCB) at TCF Center in Detroit, Michigan, where the Detroit absent voter ballots were being counted. In addition, I was the team leader for the Democratic Party challengers. I have been an election challenger at many elections in Michigan, including at the AVCB at TCF Center for the August 2020 primary election. I was present in the counting room at TCF Center on Monday, November 2 for the pre-processing of ballots and on November 3 and 4 for the continued processing and tabulation of the ballots.

4. Michigan law provides that the Democratic Party and the Republican Party are each permitted to appoint challengers to serve in precincts and in AVCBs.

5. In addition, the law provides that other organizations may apply for permission to have challengers in those locations. In addition to challengers from the two parties, I personally saw challengers with credentials from an organization identified as the Election Integrity Fund (EIF), as well as from the NAACP and the Lawyers Committee for Civil Rights.

6. I was present on Monday, November 2 from approximately 9:00 am until approximately 8:00 pm, on Tuesday, November 3, from 6:00 a.m. until approximately 3:30 a.m. on Wednesday, November 4, and again on Wednesday, November 4 from approximately 9:30 a.m. until shortly after 6:00 a.m. on Thursday, November 5.

7. During most of the time I was present on November 3 and during the day and early evening of November 4, there appeared to me to be at least 100 Republican Party

challengers inside the AVCB at TCF.  As the night of November 4 progressed, some challengers from each group left the room.

8. During that time, there were also many challengers from EIF, and I saw the EIF and Republican Party challengers regularly conferring with each other.  It was evident to me that they were coordinating their efforts.

9. This meant that the Republican Party effectively had many more challengers in the room than did the Democratic Party.

10. It was my perception that all challengers had a full opportunity to observe what was going on and to raise issues with supervisors and election officials.

11. The political parties and other authorized challenging organizations were invited to a walkthrough of the Detroit AVCB set up at TCF Center on Thursday, October 29, 2020, and were also given a detailed explanation of the procedure which would be followed and the opportunity to ask questions.  We all had access to the Michigan Election Law, the Secretary of State's Election Officials Manual, and other materials.  Nevertheless, it was my observation that many of the Republican and EIF challengers were not well trained and did not understand the process by which ballots were handled or tabulated in an AVCB.

12. Over the course of the pre-processing and tabulation, Democratic challengers reported to me about their observations and, of course, I was observing the work being done.  From time to time I, or other Democratic, Republican, and other challengers, observed minor procedural errors by election inspectors, called those errors to the attention of supervisors, and were satisfied that the supervisors had corrected the error and explained proper procedure to the election inspectors.  I spoke with several Republican challengers who expressed their view, and in a couple of cases their surprise, that there were no material issues in the counting.

3

13. I received very few reports of unresolved issues from Democratic challengers, but did receive many reports of conduct by Republican or EIF challengers that was aggressive, abusive toward the elections inspectors (and in some cases toward Democratic challengers), and/or clearly designed to obstruct and delay the counting of votes.

14. There was a person from the Election Integrity Fund, who was identified to me as Timothy Griffin, who appeared to be playing a supervisory role. I observed that he initially came into the counting area in the early morning of November 3, evidently representing himself as a duly credentialed challenger. I have been advised that Mr. Griffin is a resident of and a voter in Virginia. After a short while, I observed Mr. Griffin in the area near the door that was provided for poll observers and the press.

15. Under Michigan law, mobile phones and other electronic devices were not permitted in the counting room while polls were open – from 7:00 a.m. to 8:00 p.m. on November 3. I left my mobile phone in my car when I arrived at TCF Center on November 3, and returned to my car to retrieve it after the polls closed at 8:00 p.m.

16. Mr. Griffin remained in the observer area through the day and evening. I personally saw Republican Party challengers and EIF challengers conferring with him frequently. I (and other Democratic challengers) observed Mr. Griffin using a cell phone on November 3, and mentioned this observation to elections officials. I saw elections officials talking with him, evidently directing him to stop using his phone, but I was advised that he continued to do so. It was clear that elections officials had not confiscated his phone. I observed and received reports of numerous Republican challengers using their phones in the counting room during the period when phones were not allowed.

17. Because of COVID, there was an effort to maintain distance between the elections inspectors processing ballots at the tables. In addition, challengers were directed to attempt to maintain a six-foot distance, while being permitted to move closer for particular observations.

18. The elections officials at TCF Center advised us that all persons in the room were required to wear face masks. Officials occasionally made public address announcements reminding all present of this requirement. I observed that many of Republican and EIF challengers were scornful of the mask requirement and other attempts to protect the workers and the other persons at TCF Center.

19. Several Republican challengers who refused to comply with the mandate to wear masks, and removed masks in close proximity to elections inspectors, were escorted from the counting room by Detroit police officers. Others were engaged in conversations with elections officials, in which they evidently received warnings.

20. Throughout my time at TCF Center, I observed that Republican and EIF challengers repeatedly refused to maintain the mandated distance from the elections inspectors, and instead hovered over them, often questioning them in a hostile and belligerent manner, treating them with shocking disrespect. I observed that almost all of the Republican and EIF challengers were white, while most of the Detroit elections inspectors were Black, and found it startling and telling that this crowd of white challengers was behaving so aggressively toward the mostly Black workers.

21. The challengers were directed to address questions and concerns to elections supervisors, who were clearly identified by their white shirts with Detroit Elections Department insignia, or to team leaders (who were above the supervisors), who were clearly identified by their black shirts with Detroit Elections Department insignia. We were also permitted to interact

5

with the senior elections officials who were present, including Mr. Daniel Baxter, the Detroit Director of Elections.  We were instructed not to talk unnecessarily to the elections inspectors so as not to interfere with their work.

22.     Nevertheless, I repeatedly witnessed Republican and EIF challengers confronting and interrogating elections inspectors, asking their names and political affiliation, and demanding explanations of the counting procedures, election laws, and what they were doing.  I repeatedly witnessed elections supervisors and officials spend their time explaining to the Republican and EIF challengers the process and the roles of inspectors, supervisors, and challengers.

23.     One of the things that we asked the Democratic Party challengers to do was to try to protect the elections inspectors from abuse and interference, and to intercede and seek assistance from supervisors when the Republican and EIF challengers were materially interfering with the work of the inspectors or were particularly intimidating and offensive.

24.     I observed Republican or EIF challengers were removed from the room after intimidating and disorderly conduct, or filming in the counting room in violation of the rules.

25.     It appeared to me that while some of the Republican challengers were there in good faith, attempting to monitor the procedure, the greater number of Republican and EIF challengers were intentionally interfering with the work of the elections inspectors so as to delay the count of the ballots and to harass and intimidate election inspectors.

26.     Ballots which cannot be read by the tabulators, because, for example, they are torn or stained, must be duplicated.  In addition, all of the military and overseas ballots must be duplicated because they are submitted on forms that cannot be read by the tabulators.

6

27. I repeatedly watched the duplication procedure, which was undertaken by three elections inspectors as follows: one would read off the votes from the original ballot, the second would record these votes on the duplicated ballot, and the third would watch to ensure accuracy. The original would be placed in an envelope identified for that purpose, and the duplicate would be sent to be tabulated.

28. The inspectors endeavored to keep the process visible to challengers while maintain social distancing to the extent possible. The elections officials required that there be an opportunity for one Republican and one Democratic challenger, and one challenger from another group (such as EIF) to observe directly, and that other challengers move back from the table.

29. In my judgment this procedure allowed the challengers from each party, and often EIF, to confirm the accuracy of the duplication, and I did not receive complaints from Democratic challengers that they were unable to see. Some Republican and EIF challengers expressed dissatisfaction with the positions at which they were asked to stand. In the situations I observed, when a challenger politely stated that he or she could not see and asked for a different place, the challenger was accommodated. In a number of cases the election inspectors paused after each duplication to show the original and the duplicate to the challengers (from any organization) so that they each had the opportunity to confirm the accuracy of the duplication.

30. However, Republican and EIF challengers often tried to shove their way closer to watch the duplication process, both slowing it down and endangering the inspectors. They often began a discussion of where they could stand by shouting aggressively at the inspectors and supervisors, rather than by asking for a better vantage point. This approach served to harass and intimidate the election workers and to delay the process.

31. At one point in the early afternoon of Wednesday, the elections officials evidently determined that there were too many challengers in the room. They then directed that no additional challengers be admitted so that the numerical restriction could be honored. There remained many Republican, EIF, Democratic, and other challengers in the room. I wanted to bring in additional Democratic challengers, but accepted the determination of the elections officials.

32. After this happened, people who seemed to be Republican and EIF challengers and their supporters began pounding on the doors and windows while chanting and shouting.

33. I heard elections inspectors say that there were frightened by the shouting and pounding. I felt that the conduct going on outside the room was that of a mob, and found it threatening, even though there were police officers present.

34. Further, Affiant sayeth not.

*David Jaffe*                                  11/10/2020

David Jaffe                                             Date

State of Florida, County of Palm Beach

Subscribed and sworn to (or affirmed) before me on this __10__ day of November, 2020.

*Lillianna Alcida Lee Garibaldi*

Notary Public

My commission expires on __10/27/2023__.

LILLIANNA ALCIDA LEE GARIBALDI
Notary Public - State of Florida
Commission # GG926405
Expires on October 27, 2023

Electronic Notary Public
Notarized online using audio-video communication

8